## Docket No. 25-6858

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

---

MAXIMILIAN KLEIN, SARAH GRABERT, and RACHEL BANKS KUPCHO,

*Plaintiffs-Appellants,*

v.

META PLATFORMS, INC., FKA: Facebook, Inc.,

*Defendant-Appellee.*

---

*Appeal from a Judgment of the United States District Court for the Northern District of California,*
*No. 3:20-cv-08570-JD · Honorable James Donato, District Judge*

---

## PLAINTIFFS-APPELLANTS' OPENING BRIEF
## REDACTED VERSION – FILED PUBLICLY

---

Shana E. Scarlett
HAGENS BERMAN SOBOL
SHAPIRO, LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000 Telephone
shanas@hbsslaw.com

Sanford I. Weisburst
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 5th Avenue
New York, NY 10016
(212) 849-7000 Telephone
sandyweisburst@quinnemanuel.com

Kevin Y. Teruya
Adam B. Wolfson
Brantley I. Pepperman
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3673 Telephone
kevinteruya@quinnemanuel.com

*Counsel for Plaintiffs-Appellants,*
*Maximilian Klein, Sarah Grabert, and Rachel Banks Kupcho*

---



## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................1

JURISDICTION................................................................6

ISSUES PRESENTED.......................................................7

STATEMENT OF THE CASE.............................................7

    A.    The Parties ........................................................7

    B.    Further Background On Meta And Facebook .......................9

        1.    Meta's Dominant Position In The Personal Social Networking Services Market ......................................9

        2.    Evidence That Meta Deceived The Market Regarding Its Data And Privacy Practices ......................9

        3.    Evidence That Meta's Deception Injured Users ......................11

    C.    Decisions Below................................................13

        1.    Judge Koh's Order Substantially Denying Meta's Motion To Dismiss ......................................13

        2.    Judge Donato's Order Denying Class Certification ................15

        3.    Judge Donato's Summary-Judgment Order..............................17

SUMMARY OF ARGUMENT ................................................17

STANDARD OF REVIEW ...................................................20

ARGUMENT ....................................................................22

I.    THE DISTRICT COURT MISAPPLIED ANTITRUST LAW AND USURPED THE JURY'S ROLE IN EXCLUDING PROFESSOR ECONOMIDES' OPINIONS AND GRANTING SUMMARY JUDGMENT TO META ................................................22

    A.    The District Court Failed To Recognize The Legal Distinction Between The Actual World And The But-For World And Therefore Held Dispositive A Lack Of Evidence Of Meta Paying Facebook Users In The Actual World................................................23

    B.    The District Court Improperly Usurped The Jury's Role In Resolving Disputed Facts and Inferences At Summary Judgment ................................................27

i

1.  The District Court Misunderstood The Standard To Allow The Court To Resolve Disputes Concerning The Expert's Underlying Evidence At The Summary-Judgment Stage.........28

2.  Evidence That Meta Considered Paying Facebook Users For Their Data ............................................................33

3.  Evidence That Meta And Other Data Companies Paid Participants In The Market-Research Context.........................38

4.  Academic And Governmental Literature Supporting That Greater Competition Can Lead A Service To Pay Users .........43

II.  THE DISTRICT COURT ERRED IN DENYING CLASS CERTIFICATION BASED ON A DEFICIENCY AFFECTING ALL CLASS MEMBERS EQUALLY AND THAT WILL NO LONGER BE A DEFICIENCY IF SUMMARY JUDGMENT IS VACATED............47

CONCLUSION .......................................................................50

STATEMENT OF RELATED CASES ......................................52

CERTIFICATE OF COMPLIANCE........................................53

CERTIFICATE OF SERVICE ................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
 738 F.3d 960 (9th Cir. 2013) ..............................................................30

*Alcantar v. Hobart Serv.*,
 800 F.3d 1047 (9th Cir. 2015) ............................................................49

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
 92 F.3d 781 (9th Cir. 1996) ...............................................................21

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013)....................................................................6, 48

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
 303 F.3d 256 (2d Cir. 2002) ..............................................................31

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
 537 F. Supp. 3d 273 (N.D.N.Y. 2021)...............................................47

*Bigelow v. RKO Radio Pictures*,
 327 U.S. 251 (1946).............................................................................25

*Brown v. Google LLC*,
 685 F. Supp. 3d 909 (N.D. Cal. 2023)................................................40

*Brown v. Google, LLC*,
 Case No. 20-cv-3664, 2022 WL 17961497 (N.D. Cal. Dec. 12,
 2022) ..............................................................................................39, 40

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
 47 F.4th 1278 (11th Cir. 2022) ..........................................................32

*Chelson v. Oregonian Pub. Co.*,
 715 F.2d 1368 (9th Cir. 1983) ............................................................37

*City of Pomona v. SQM N. Am. Corp.*,
 750 F.3d 1036 (9th Cir. 2014) ..............................................30, 32, 46

*Clarkson v. Alaska Airlines, Inc*.,
   59 F.4th 424 (9th Cir. 2023) ................................................................36

*Clausen v. M/V NEW CARISSA*,
   339 F.3d 1049 (9th Cir. 2003) .............................................................45

*Cohen v. Cohen*,
   125 F.4th 454 (3d Cir. 2025) ...............................................................31

*Cont'l Ore Co. v. Union Carbide & Carbon Corp*.,
   370 U.S. 690 (1962)..............................................................................21

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*,
   402 F.3d 1092 (11th Cir. 2005) ...........................................................32

*Devereaux v. Abbey*,
   263 F.3d 1070 (9th Cir. 2001) (*en banc*)............................................20

*Elosu v. Middlefork Ranch Inc*.,
   26 F.4th 1017 (9th Cir. 2022) .......................................................*passim*

*Fed. Trade Comm'n v. Meta Platforms, Inc*.,
   Case No. 20-cv-3590, 2025 WL 3458822 (D.D.C. Dec. 2, 2025),
   *appeal pending*, No. 26-5028 (D.C. Cir.).............................................14

*Fed. Trade Comm'n v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...............................................................22

*Gila River Indian Cmty. v. Schoubroek*,
   145 F.4th 1058 (9th Cir. 2025) ............................................................46

*Goebel v. Denver & Rio Grande W. R. Co*.,
   346 F.3d 987 (10th Cir. 2003) .............................................................31

*Hangarter v. Provident Life & Acc. Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) ...............................................................29

*Hardeman v. Monsanto Co*.,
   997 F.3d 941 (9th Cir. 2021) ...............................................................21

*Hauk v. JP Morgan Chase Bank USA*,
   552 F.3d 1114 (9th Cir. 2009) .............................................................20

iv

*Hyer v. City & Cnty. of Honolulu*,
  118 F.4th 1044 (9th Cir. 2024) ........................................................38, 41, 42, 43

*In re Androgel Antitrust Litig. (No. II)*,
  Case No. 09-cv-955, 2018 WL 2984873 (N.D. Ga. June 14, 2018) ..................26

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) .............................................................................39

*In re Glumetza Antitrust Litig.*,
  Case No. 19-cv-05822, 2021 WL 1817092 (N.D. Cal. May 6,
  2021) ...........................................................................................................5, 25, 26

*In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust
  Litig.*,
  Case No. 20-cv-1076, 2025 WL 992004 (D. Del. Apr. 2, 2025) ......................26

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
  Case No. 14-md-02503, 2018 WL 563144 (D. Mass. Jan. 25, 2018) ...............26

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  Case No. 18-md-2836, 2022 WL 4362166 (E.D. Va. Aug. 15,
  2022) ...................................................................................................................26

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981)....................................................................................5, 18, 25

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
  275 F.3d 762 (9th Cir. 2001) .............................................................................47

*Lytle v. Nutramax Laboratories, Inc.*,
  114 F.4th 1011 (9th Cir. 2024) .....................................................................48, 49

*Miles v. Kirkland's Stores Inc.*,
  89 F.4th 1217 (9th Cir. 2024) ............................................................................21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) .............................................................................22

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  993 F.3d 774 (9th Cir. 2021), *reh'g en banc granted on other
  grounds*, 31 F.4th 651 ......................................................................................25

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ........................................................44, 45

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ................................................................22

*Richards v. Cnty. of San Bernardino*,
39 F.4th 562 (9th Cir. 2022) ................................................................37

*Rodriguez v. Google LLC*,
772 F. Supp. 3d 1093 (N.D. Cal. 2025) ...............................................40

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,
161 F.3d 77 (1st Cir. 1998) ..................................................................30

*Shields v. World Aquatics*,
Case Nos. 23-15092 & 23-15156, 2024 WL 4211477 (9th Cir.
Sept. 17, 2024) .....................................................................................16

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) ...........................................................2, 22

*Stockwell v. City & Cnty. of San Francisco*,
749 F.3d 1107 (9th Cir. 2014) ........................................................48, 49

*Teradata Corp. v. SAP SE*,
124 F.4th 555 (9th Cir. 2024) .......................................................*passim*

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)........................................................................20, 48

*United Food & Com. Workers Loc. 1776 & Participating Emps.
Health & Welfare Fund v. Teikoku Pharma USA*,
296 F. Supp. 3d 1142 (N.D. Cal. 2017)...............................................26

*United States v. Morales*,
108 F.3d 1031 (9th Cir. 1997) .............................................................21

*Wendell v. GlaxoSmithKline LLC*,
858 F.3d 1227 (9th Cir. 2017) ........................................................29, 44

*Yokoyama v. Midland Nat. Life Ins. Co.*,
594 F.3d 1087 (9th Cir. 2010) .............................................................21

## **Statutes**

15 U.S.C. § 15 .................................................................................6

28 U.S.C. § 1291 .............................................................................6

28 U.S.C. § 1331 .............................................................................6

28 U.S.C. § 1332 .............................................................................6

28 U.S.C. § 1337 .............................................................................6

## **Other Authorities**

Fed. R. Civ. P. 23 ..............................................................16, 47, 48

Fed. R. Civ. P. 56 ..............................................................................5

Fed. R. Evid. 702 ....................................................................*passim*

## INTRODUCTION

Defendant-Appellee Meta Platforms, Inc.'s "Facebook" is the largest personal social networking service ("PSNS") in the United States. Facebook enables users to share photographs, stories, and other content with family and friends.

Facebook users generate data—such as which non-Facebook websites they visit—that Meta can collect. As Meta's CEO Mark Zuckerberg has acknowledged, "[t]he No. 1 thing that people care about is privacy and the handling of their data." 4-ER-569. Meta built and maintained its competitive position on the notion that Facebook users would have control over their data and it would remain private.

At the same time, Meta's business success depends on *not* keeping users' data private but instead collecting and using it for profit. If, for example, a user planning a ski trip searches the internet for hotels in Lake Tahoe, Meta sees this and can specifically target the user with advertisements it sells to ski shops, Lake Tahoe restaurants, and the like. This creates an inevitable tension between users' desire to keep their data private, and Meta's interest in exploiting it to sell targeted advertisements.

Plaintiffs-Appellants—Maximilian Klein, Sarah Grabert, and Rachel Banks Kupcho (together, "Klein")—are Facebook users who sued Meta under Section 2 of the Sherman Antitrust Act on behalf of themselves and a putative class of persons who used Facebook between 2016 and 2020. They claimed that Meta monopolized

the PSNS Market by misrepresenting Facebook's data and privacy practices to the market, thereby suppressing competition from other PSNS providers that delivered better data control, security, and privacy. Had Meta not so deceived the market, competition would have forced Meta either directly to pay users for their data or otherwise to provide them with equivalent monetary value (*e.g.*, points, discounts, or coupons). Indeed, many companies in related contexts in the real world—including grocery stores, credit card companies, and online companies like Google, Amazon, Microsoft, and Meta itself—compensate consumers for their data.

One element of a Sherman Act Section 2 claim is antitrust injury: "an injury 'that flows' from the unlawful conduct and that is 'the type the antitrust laws were intended to prevent.'" 2-ER-152–53 (quoting *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013)). Judge Koh denied Meta's motion to dismiss on this element, holding, *inter alia*, that Klein and the putative consumer class

> adequately allege that their injury "flows" from Facebook's monopolization of the Social Network [*i.e.*, PSNS] and Social Media Markets. … Consumers allege that, had Facebook not eliminated competition in these markets, Consumers would have been able to "select a social network or social media application which offers consumers services that more closely align the consumers' preferences, such as with respect to the content displayed, quantity and quality of advertising, and options regarding data collection and usage practices." … *To support this allegation, Consumers point out that, in competitive markets, some companies pay users for their data.* For example, "[w]hen consumers agree to use Microsoft's 'Bing' search engine and allow Microsoft to collect their data, Microsoft ... compensates consumers with items of monetary value."

2

2-ER-155 (emphasis added).  Judge Koh also cited Klein's allegations that, in an analogous context, "Facebook itself paid certain users 'up to $20.00 per month[.]'" 2-ER-154.

Klein's antitrust-injury showing only became stronger by the time of his motion for class certification and his opposition to Meta's motion for summary judgment.  Klein proffered, for example, this email from Meta's



4-ER-469–70 (highlighting added).[1] Based on this and similar evidence and economic literature, Klein's expert—Professor Nicholas Economides of New York University—opined that, absent Meta's deception, Meta would have compensated Facebook users for the ability to collect and to use their data.

Even though Klein had bolstered his proof beyond the allegations Judge Koh had sustained, the district judge to whom the case was reassigned, Judge Donato, excluded Economides' opinions, denied class certification, and granted Meta summary judgment. 1-ER-12 (order denying class certification); *see also* 1-ER-4–5 (summary-judgment order adopting same reasoning). Judge Donato found Economides' evidence and theory "not convincing," 1-ER-20, and "implausible," stating he was "not buying" it because it was "completely inconsistent with [his] experience" and the experiences of his "friends" and "family members." 3-ER-304–07. Judge Donato discounted, among other things, the Meta email reproduced above, on the ground that Meta had only "considered" the idea of paying users before "ultimately reject[ing] it," 1-ER-21–23.

Judge Donato erred. At the threshold, Judge Donato conflated the but-for world (in which Meta would have truthfully disclosed its data and privacy practices) with the actual world (in which it did not). Specifically, Judge Donato held, as a

---

[1] Aside from in the above image, yellow highlighting denotes information that Meta or non-parties designated below as "Highly Confidential" or "Confidential."

matter of law, that evidence Meta merely contemplated paying—but did not ultimately pay—users for their data in the *actual world* compels the conclusion that Meta would not have paid users in the *but-for world*. 1-ER-21–23. That was error because "[t]he vagaries of the marketplace usually deny us sure knowledge of what [the] plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981) (cleaned up); *see also, e.g.*, *In re Glumetza Antitrust Litig.*, Case No. 19-cv-05822, 2021 WL 1817092, at *13 (N.D. Cal. May 6, 2021) (a plaintiff need not even show that a defendant "of our world actually contemplated a given scenario within the but-for world").

Judge Donato compounded this error by making findings of fact at the summary-judgment stage. *See, e.g.*, 1-ER-17–26 (order denying class certification); 1-ER-4–5 (summary-judgment order adopting reasoning from order denying class certification). Neither Federal Rule of Civil Procedure 56 nor Federal Rule of Evidence 702 allows a district court to step into the jury's shoes and to resolve disputes about the strength of an expert's underlying evidence. As this Court held in *Elosu v. Middlefork Ranch Inc*., 26 F.4th 1017 (9th Cir. 2022), whether the expert's "hypothesis" is "corroborated by other evidence on the record … is for the litigants to argue, and for the jury to decide," *id.* at 1026. "Select[ing] between

competing versions of the evidence" is a "factfinding ste[p] that exceed[s] the court's gatekeeping role." *Elosu*, 26 F.4th at 1020, 1026.

Judge Donato also erred in denying class certification. Klein's theory of antitrust injury was that Meta had deceived the market regarding its data and privacy practices, and that a competitive market receiving truthful disclosures from Meta in the but-for world would demand that Meta pay users for the ability to collect and to use their data. Judge Donato never contested that this theory was common to the class or relied on common evidence; instead, Judge Donato rejected the theory on the merits as to the entire class. But where "the class is entirely cohesive," "[i]t will prevail or fail in unison," *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459–60 (2013), and certification should be granted. If summary judgment is vacated, the entire class will have the opportunity to prevail at trial using this common theory and evidence.

## JURISDICTION

The district court had subject matter jurisdiction over Klein's federal antitrust claims pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1332, and 1337(a). The district court granted summary judgment and entered final judgment for Meta on September 29, 2025. 1-ER-2–3. Klein timely noted his appeal on October 27, 2025. 3-ER-310. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether the district court erred in granting summary judgment to Meta based on a supposed lack of evidence of antitrust injury following the court's exclusion of Professor Economides' opinions.

      a.      Whether the district court erred in ruling, as a matter of law, that evidence a monopolist did not implement certain conduct in the actual world of its anticompetitive conduct establishes that the monopolist would not engage in that conduct in the hypothetical but-for world devoid of the monopolist's anticompetitive conduct.

      b.      Whether, in any event, the district court improperly usurped the jury's role in resolving genuine and material factual disputes about the underlying evidence upon which Economides relied.

2.      Whether the district court erred in denying class certification based on the notion that Klein's and the class's theory of antitrust injury fails for a common reason, a failure that disappears as to the entire class if summary judgment is vacated.

## STATEMENT OF THE CASE

### A.      The Parties

Klein and his two individual co-plaintiffs, Sarah Grabert and Rachel Banks Kupcho, had user accounts on Facebook.  1-ER-12.  They asserted claims against Meta on behalf of themselves and a proposed class "consisting of all persons in the

United States who maintained and used a Facebook profile between December 3, 2016 and December 3, 2020[.]"  2-ER-83; Dkt. 793-1.[2]

For much of its history, Meta (the company) was known as "Facebook."  1-ER-12 n.1.  Meta still uses "Facebook" to describe the service at issue, a PSNS that facilitates online interactions between a user and his or her friends and family members.  5-ER-660–61.  For example, a user might post photographs and descriptions of her birthday party for others to see and to comment on.  Facebook and Instagram (another Meta service) are the two largest PSNSs in the United States.  5-ER-817–18.

While Meta did not charge its users money to have a Facebook account during the period at issue, the service was not "free" to users.  5-ER-818.  Instead, Meta took users' data (such as which websites they visited), analyzed it to determine which users to target with which kinds of advertisements, and then sold that ability to advertisers for money.  5-ER-821–22; *supra*, at 1 (ski-trip example).  ███████

████████████████████████████████████████████████████████

███████████████████████████  4-ER-560; *see also* 2-ER-46 (Meta co-founder explaining Facebook is "not actually free" and users "pay" with their "data").

---

[2]  Klein sued on December 3, 2020.  3-ER-354 (Docket Sheet, Dkt. 1).  The statute of limitations for Klein's damages claim is four years, 15 U.S.C. § 15b, such that Klein defined the class period as December 3, 2016, to December 3, 2020.

### B. Further Background On Meta And Facebook

#### 1. Meta's Dominant Position In The Personal Social Networking Services Market

Examples of PSNSs besides Meta's Facebook and Instagram include Snapchat, MeWe, and now-defunct Google+, Myspace, Orkut, and Friendster. 5-ER-817. Meta's share of the PSNS Market between December 2016 and December 2020 was at least 78%. 5-ER-785–89.

#### 2. Evidence That Meta Deceived The Market Regarding Its Data And Privacy Practices

Meta's Zuckerberg conceded that "[t]he No. 1 thing that people care about is privacy and the handling of their data." 4-ER-569. He also acknowledged that ███████████████████████████████████████████████. 4-ER-649. Other Meta executives likewise recognized the connection between being perceived as a good steward of users' data and Meta's success in the market: ████████ ███████████████████████████████████████████████████████ ██████ 4-ER-530.

Meta understood that giving users the appearance of ██████████ ████████ was critical to its success. 4-ER-435. Being perceived as trustworthy was part of Meta's ████████ 4-ER-435, and ████████████████████ ████████████████████ 4-ER-566. As Meta told Congress, ████████

9

███████████████████████████████████████████

████████████████████████████████ 4-ER-451.

But evidence showed that Meta deceived the market regarding its privacy and data practices.  5-ER-663–76.  As Meta's Chief Operating Officer conceded, ████

███████████████████████████████████████████

███████████████████████████ 4-ER-557–58.

For example, in 2018, Meta was embroiled in a scandal involving Cambridge Analytica, a third party that collected Facebook users' data for political purposes. Zuckerberg had promised in 2014 ████████████████████████

███████████████████████████████████████. 4-ER-430.  But Meta ██████████████████████████████████

███████████████████████████████████████████

████████████████ *Id.*  After the scandal, Meta sought to rebuild market confidence by publicly announcing an App Developer Investigation and pledging to share the results.  5-ER-761.  But ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████ 4-ER-594–601; 4-ER-590–91.

For another example, Meta publicly promised that Facebook users had "complete control" over their data.  5-ER-760.  But Meta ████████████████████████

10



4-ER-615–16,

4-ER-446,

4-ER-449. At bottom, Meta conceded

4-ER-456,

4-ER-449.

Because the nature of Meta's deception was secret and highly technical, users and competitors could not effectively discover or counteract it. 5-ER-663–66. Executives from [REDACTED]—Meta's two principal PSNS competitors during the relevant period—testified that [REDACTED]

4-ER-623–25, 630–35; 4-ER-634; 4-ER-606–09.

### 3.    Evidence That Meta's Deception Injured Users

To establish antitrust injury, Klein relied on Meta's own documents and the expert analysis of Professor Economides. Economides opined that Meta's deception allowed Meta to take and to use users' data for free, whereas in a world of truthful disclosures Meta would have had to pay users for that privilege. 5-ER-676–713.

In support of his opinion, Economides first analyzed academic and government literature recognizing that increased competition generally forces firms to "lower their prices [and/or increase their payments to customers] in the face of

competitive alternatives if they want to maintain their market share." 5-ER-679–80 & n.560; 5-ER-821–22 & nn.111, 117, 119.

Next, Economides considered actual examples that bear out this prediction in analogous markets that are more competitive than the PSNS Market. One example is the market-research context, in which companies (including Amazon, Google, and even Meta) do not provide the user an ongoing service or function but instead make an explicit payment to the user in exchange for the user providing his or her data. 5-ER-716–32; 5-ER-822, 831–39, 842–48.

Finally, Economides observed that, in the actual world of the PSNS Market in which Meta's deception suppressed competition, Meta repeatedly considered paying users for their data. For example, as discussed in the Introduction, *supra*, at 3,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████ 4-ER-469–70. Economides also evaluated Meta's other data-for-payment proposals, opining that, if Meta contemplated paying users for their data in the actual world of Meta's deception that suppressed competition, Meta would actually make such payments in the but-for world of greater competition between Meta and other PSNS providers. 5-ER-691–95; 5-ER-823–27.

Although Economides relied on the foregoing to opine that Facebook would have made *some* payment to users in the but-for world, he went further and estimated the actual amount of that payment. Economides employed the yardstick method, which "compares prices in the market affected by alleged anticompetitive conduct to prices paid in other comparable markets that are unaffected by the anticompetitive conduct." 5-ER-831–32. Economides specifically looked to market-research programs offered by companies including Meta, Google, Amazon, Comscore, and Nielsen. 5-ER-718; 5-ER-834–35. After studying the prices those companies paid for similar data, Economides determined that, in the but-for world, Meta would likely compensate PSNS users at a rate of $5 per month for each month they provided their data (with $3.50 or $6.25 also possibilities). 5-ER-735–40. Economides further explained that this number is plausible from Meta's perspective because Meta could have paid all Facebook users in the United States during the 2016–2020 time period ██████████████████████████████████ 5-ER-837 & n.177.

## C. Decisions Below

### 1. Judge Koh's Order Substantially Denying Meta's Motion To Dismiss

Klein's complaint asserted five causes of action, the first four under Section 2 of the Sherman Act: (1) monopolization of the PSNS Market;[3] (2) attempted

---

[3] Klein's consolidated complaint used the term "Social Network" market; Klein and his experts later added the qualifier "Personal" (and the acronym "PSNS"). The

monopolization of the PSNS Market; (3) monopolization of the Social Media Market;[4] (4) attempted monopolization of the Social Media Market; and (5) unjust enrichment under California law. 2-ER-279–87.

Judge Koh denied Meta's motion to dismiss in relevant part. 2-ER-92–94.[5] Judge Koh held that Klein's theory of harm—that in a but-for world where Meta honestly disclosed its data and privacy practices, Meta would have paid users for their data—was plausible and could satisfy the antitrust-injury element of Klein's claims. Specifically, Judge Koh explained that "there is no doubt" that users' "information and attention has material value," "some companies pay users for their data," and "Facebook itself paid certain users" for their data. 2-ER-152–56 (cleaned up); *see also supra*, at 2–3.[6]

_____

Federal Trade Commission sued Meta in the U.S. District Court for the District of Columbia asserting a similar PSNS Market. That court denied summary judgment on a market-definition issue, and then, after a bench trial, found that the market should be defined more broadly than the FTC proposed. *Fed. Trade Comm'n v. Meta Platforms, Inc*., Case No. 20-cv-3590, 2025 WL 3458822, at *1, *9–*11 (D.D.C. Dec. 2, 2025), *appeal pending*, No. 26-5028 (D.C. Cir.). Market definition was *not* the basis for the district court's summary-judgment or class-certification rulings here, and, in any event, the D.D.C. decision does not bind this Court.

[4] The Social Media Market is broader than the PSNS Market. Although Judge Koh accepted the Social Media Market at the motion-to-dismiss stage, 2-ER-107, Klein subsequently focused on the PSNS Market, and the Social Media Market is not at issue on this appeal.

[5] Judge Koh became a Judge of this Court before issuing that decision, and thus issued it as a Circuit Judge sitting by designation on the district court. 2-ER-194.

[6] Klein also asserted additional theories of anticompetitive conduct beyond Meta's deception regarding its data and privacy practices. Judge Koh dismissed those

### 2. Judge Donato's Order Denying Class Certification

After completing fact discovery and serving class-certification expert reports, Klein moved for class certification, supported by Professor Economides and three other experts. Judge Donato ordered Klein to re-submit the motion supported by no more than one expert and supporting materials limited to around "a hundred pages." 2-ER-84; 3-ER-297–98.[7] Klein re-submitted the motion with abridged reports from Economides. Meta moved to exclude Economides' opinions under *Daubert* and Federal Rule of Evidence 702, and Klein opposed the motion.

At a hearing, Judge Donato stated: (1) "I don't find" Plaintiffs' antitrust-injury theory "plausible," (2) none of Judge Donato's "friends" or "family members" had "ever come to me and said … [social media companies] are paying me" to use a service, and (3) "I'm not buying this theory … because it is completely inconsistent with my experience of our online world." 3-ER-303–07.

Judge Donato later issued a written ruling—consistent with his remarks, but now omitting his friends' and family's personal experiences—excluding

---

theories and Klein's unjust-enrichment claim, 2-ER-94, and Klein does not challenge those rulings on this appeal.

[7] For summary judgment and trial, Judge Donato instructed that Klein could "have one liability expert and one damages expert," and if Klein wanted "an additional [third] expert," he would first need to make a "proffer." 2-ER-84. Klein identified Economides and Joseph Farrell, Dkt. 821, and proffered Sarah Lamdan as a third expert. Dkt. 821. Judge Donato never ruled on the proffer as to Lamdan and limited the topics on which Economides and Farrell could offer testimony. 2-ER-81.

Economides' antitrust-injury opinions and denying class certification on that basis. 1-ER-27; *see also* 1-ER-12 n.3 (amended order "correct[ing] a few typographical errors").

Judge Donato denied class certification on the ground that Klein could not demonstrate antitrust injury as to anyone in the proposed class without the opinions of Economides, and that Economides' opinions should be excluded. Judge Donato conceded that Economides is "well-qualified" and there is support for the "general concepts" of Economides' opinions in "the economic literature." 1-ER-13, 17–18. Judge Donato also acknowledged that Meta paid users for their data in the market-research context, and that Meta had considered paying Facebook users for their data in the PSNS context—evidence upon which Economides relied in rendering his opinions. 1-ER-21–24. But because Meta did not ultimately implement such payments in the actual world, Judge Donato discounted that underlying evidence and found Economides' opinions "not convincing" and resting on "too great an analytical gap between the data and the opinion proffered." 1-ER-16, 20–21.[8]

---

[8]  Klein sought interlocutory appeal of the order denying class certification under Federal Rule of Civil Procedure 23(f). This Court denied review. *Klein v. Meta Platforms, Inc.*, Nos. 25-000853 & 25-00983 (9th Cir.), Dkts. 26, 27. That does not prevent Klein from challenging the order on the instant appeal from final judgment. *Shields v. World Aquatics*, Case Nos. 23-15092 & 23-15156, 2024 WL 4211477, at *1, *4 (9th Cir. Sept. 17, 2024) (in antitrust case, reversing summary judgment and then reversing denial of class certification after final judgment).

### 3.    Judge Donato's Summary-Judgment Order

Meta moved for summary judgment regarding Klein's individual claims, arguing, *inter alia*, that Klein lacks evidence from which reasonable jurors could find antitrust injury.  Meta also filed a motion to exclude Economides' opinions at the summary-judgment stage.  Klein opposed Meta's motions.

Judge Donato granted summary judgment to Meta.  1-ER-4.  Judge Donato's order excluded Economides' injury opinions "for the reasons discussed in the prior order [on the motion for class certification]."  1-ER-4–7.  Judge Donato then concluded that "antitrust injury is an essential element" of Plaintiffs' antitrust claims, and "[t]he exclusion of Dr. Economides' injury opinions guts plaintiffs' case."  1-ER-8–9.

This appeal followed.

## SUMMARY OF ARGUMENT

## I

The district court granted Meta summary judgment based upon a supposed absence of evidence of antitrust injury after the court excluded Professor Economides' opinions on that issue.  That ruling rested on multiple errors.

*First*, the district court erred as a matter of law in holding Klein to the burden of demonstrating that Meta had ever paid Facebook users for their data.  "The vagaries of the marketplace usually deny us sure knowledge of what [the] plaintiff's

17

situation *would have been* in the absence of the defendant's antitrust violation," so "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co.*, 451 U.S. at 566–67 (emphasis added) (cleaned up). Accordingly, the proper inquiry is not whether Meta had paid Facebook users in the *actual world* of Meta's deception regarding its data and privacy practices, but whether the evidence plausibly supports an inference that Meta *would have paid Facebook users in the but-for world* of no deception and greater competition.

*Second*, in evaluating that evidence at the summary-judgment stage, the district court improperly made factual findings. The court did not have license to do so simply because the persuasiveness of the underlying evidence arose in the context of whether to admit an expert opinion that relied on such evidence. Instead, "Rule 702's 'sufficient facts or data' element requires foundation, not corroboration," and whether the expert's "hypothesis" is "corroborated by other evidence on the record … is for the litigants to argue, and for the jury to decide." *Elosu*, 26 F.4th at 1025–26.

Here, reasonable jurors could side with Economides' view of the evidence, even if Meta's expert (Dr. Tucker) and the district court disagreed with it. For example, the district court discounted internal Meta discussions of paying Facebook users for data on the supposed ground that they "concerned user data that Meta could

not or did not already obtain through Facebook's social-networking service." 1-ER-21. But reasonable jurors could find that the data *was* exactly what Meta was already been obtaining; Meta documents spoke of a need for ███████████████ as a ████████████████████████████ resulting from Apple's and Google's software updates on their respective web browsers and operating systems that allowed users (unless they opted out) to prevent Meta from accessing and using certain of their data. 4-ER-535; 5-ER-693–94.

For another example, while Judge Donato (unlike Judge Koh and Economides) found inapposite the market-research context in which companies paid participants for their data, Meta itself ████████████████████████████ ████████████████████████████████████████ ███████, stating that ████████████████████████ 4-ER-459–61 (emphasis added). It was for a jury, not the district court, to examine this and other evidence and determine whether it is "convincing." 1-ER-20.

## II

The district court denied class certification not because Klein's claims or evidence differ from those of the putative class members, but rather based on the court's belief that neither Klein nor any class member can demonstrate antitrust injury. But "[w]hen, as here, the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—an alleged failure of

19

proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016) (cleaned up).

To be sure, the district court subsequently, after denying class certification, relied on the same "merits" rationale at the summary-judgment stage. But as shown in Point I of this brief, the court's summary-judgment decision was flawed and should be vacated. If this Court agrees, Klein and the putative class will have the opportunity to pursue their common theory and proof at trial.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Teradata Corp. v. SAP SE*, 124 F.4th 555, 572 (9th Cir. 2024). Summary judgment is appropriate only "if … there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the "burden of demonstrating the absence of a genuine issue of fact for trial." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*). Further, a court must "view the evidence and all inferences therefrom in the light most favorable to the non-moving party and may not weigh the evidence or make credibility determinations." *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1117–18 (9th Cir. 2009). "[B]ecause antitrust cases consist of primarily factual issues, summary judgment

should be used 'sparingly.'" *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996).[9]

A district court's "decision to exclude expert testimony" is reviewed "for abuse of discretion." *Teradata*, 124 F.4th at 566. But a district court "abuses its discretion" "when it bases its decision on an erroneous view of the law." *United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir. 1997). "Whether the district court applied the correct legal standard under *Daubert* is reviewed de novo." *Hardeman v. Monsanto Co.*, 997 F.3d 941, 960 (9th Cir. 2021). Moreover, it is an error of law and thus an abuse of discretion for a district court to "assume[] a factfinding role in" the *Daubert* analysis because "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu*, 26 F.4th at 1023, 1026.

A denial of class certification is reviewed for abuse of direction, *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1221 (9th Cir. 2024), but that standard is again satisfied by an error of law, and this Court reviews *de novo* whether the district court made such an error. *See, e.g.*, *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d

---

[9]   *See also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (in antitrust cases, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each").

1087, 1091 (9th Cir. 2010); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022).

## ARGUMENT

## I. THE DISTRICT COURT MISAPPLIED ANTITRUST LAW AND USURPED THE JURY'S ROLE IN EXCLUDING PROFESSOR ECONOMIDES' OPINIONS AND GRANTING SUMMARY JUDGMENT TO META

A Sherman Act Section 2 claim requires: (1) "monopoly power," or a "dangerous probability" of obtaining such power; (2) "the willful acquisition or maintenance of that power"; and (3) "causal antitrust injury." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (cleaned up); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). Causal antitrust injury is "injury 'that flows' from the unlawful conduct and that is 'the type the antitrust laws were intended to prevent.'" 2-ER-152–53 (quoting *Somers*, 729 F.3d at 963).

The district court addressed only the antitrust-injury element, excluded Economides' opinions regarding that element, and granted summary judgment based on that exclusion. 1-ER-12 (order denying class certification); 1-ER-4–5, 9 (summary-judgment order incorporating reasoning of previous order denying class certification). That was error for two reasons. *First*, the district court failed to recognize the legal distinction between the actual world and the but-for world, and thus improperly held that Klein needed to adduce evidence that Meta had paid Facebook users for their data in the actual world. *Second*, the district court

22

improperly resolved factual disputes concerning the underlying evidence and the inferences to be drawn from it.

**A.** **The District Court Failed To Recognize The Legal Distinction Between The Actual World And The But-For World And Therefore Held Dispositive A Lack Of Evidence Of Meta Paying Facebook Users In The Actual World**

The district court discounted evidence that Meta considered paying Facebook users for their data because the proposals "never ripened into ... an actual practice." 1-ER-21 (order denying class certification); 1-ER-4 (summary-judgment order adopting same reasoning). Although the court improperly usurped the jury's role in deciding the import of this evidence at the summary-judgment stage (which we address *infra*, Point I.B), the court erred at the threshold in holding as a matter of law that Klein even had to adduce evidence of Meta paying Facebook users in the actual world. That holding misperceives the difference between the actual world of the defendant's antitrust violation and the but-for world in which the defendant would not have committed that violation. The but-for world, by definition, is a hypothetical world. Therefore, reasonable inferences as to the nature of the but-for world—not proof that a particular event occurred in the actual world—are all the law requires.

Economides' opinion, again, is that in a but-for world where Meta would have truthfully disclosed its data and privacy practices and therefore faced more competition from other PSNS providers, Meta would have had to offer users

23

something more for their data—"a direct monetary payment" or the equivalent—or else risk losing them to rivals. 5-ER-679–80, 686; 5-ER-820, 824. Economides relied, *inter alia*, on the fact that, even in the actual world where competition was suppressed by Meta's deception, Meta had contemplated paying users for their data, and Economides opined that, in the but-for world, Meta would have gone further and implemented this idea. As discussed above, Meta's ███████████████████ ██████████ wrote: ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ 4-ER-469–70. Economides also considered additional, similar Meta proposals, which we discuss in Point I.B.2, *infra*.

If the district court were correct that a plaintiff must have evidence that the defendant engaged in conduct in the actual world (here, paying users for data) in order for reasonable jurors to find that the defendant would have engaged in that conduct in the but-for world, then a monopolist could always escape antitrust liability. For example, a monopolist that owns the gas stations in a town, charges high prices for gasoline in the actual world, and contemplated but did not implement lower prices in the actual world, could argue that the absence of lower prices in the actual world means that prices would not be lower in the but-for world of greater competition. That defies logic, and, as explained below, is not the law.

24

Contrary to the district court's approach, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong"—here, Meta's deception as to its data and privacy practices—"has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946). Thus, showing injury and calculating damages in antitrust cases "often requires comparing the actual world with a 'hypothetical' world that would have existed 'but for' the defendant's unlawful activities." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 788 (9th Cir. 2021) (cleaned up), *reh'g en banc granted on other grounds*, 31 F.4th 651. And "[t]he vagaries of the marketplace usually deny us sure knowledge of what [the] plaintiff's situation would have been in the absence of the defendant's antitrust violation," so "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co.*, 451 U.S. at 566–67 (cleaned up).

Accordingly, an antitrust plaintiff need not even show that the defendant "of our world actually contemplated a given scenario within the but-for world." *Glumetza*, 2021 WL 1817092, at *13. To insist on such evidence "rests upon the befuddling notion that our actors must have contemplated what they would have done in a but-for world which, due to defendants' antitrust violation, *never happened*." *Id.* at *15 (emphasis in original). In *Glumetza*, the court denied

25

summary judgment, rejecting the defendants' argument that "plaintiffs can point to no evidence that defendants … or any third parties contemplated any of plaintiffs' but-for scenarios." 2021 WL 1817092 at *13. Numerous other courts agree. *See, e.g.*, *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1190 (N.D. Cal. 2017) (denying *Daubert* motion and rejecting argument that expert's opinions were "not based on sufficient facts in the record"; "Because this case is set in a but-for world, it is not surprising that no evidence shows that defendants were contemplating anything other than the actual Settlement."); *In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, Case No. 20-cv-1076, 2025 WL 992004, at *4 (D. Del. Apr. 2, 2025) (denying summary judgment; defendants' argument "that Plaintiffs must prove that the but-for hypothetical alternative … actually occurred … cannot be the law").[10]

---

[10] *See also, e.g.*, *In re Androgel Antitrust Litig. (No. II)*, Case No. 09-cv-955, 2018 WL 2984873, at *17 (N.D. Ga. June 14, 2018) (denying summary judgment on similar grounds; "[a]ny criticism the Defendants have of the experts' methodologies or conclusions are best handled through cross-examination and the production of contrary evidence"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, Case No. 14-md-02503, 2018 WL 563144, at *21 (D. Mass. Jan. 25, 2018) (such a requirement "would be an almost impossible standard to require of Plaintiffs, given that this is a but-for scenario"); *In re Zetia (Ezetimibe) Antitrust Litig.*, Case No. 18-md-2836, 2022 WL 4362166, at *7 (E.D. Va. Aug. 15, 2022) ("The trier of fact may find that the Actual World and But-For World are factually distinct," and "substantial divergence between [defendant's] Actual World conduct and a Reasonable Firm's predicted conduct is unsurprising.").

The district court contravened this precedent when it held that Economides failed to point to evidence that Meta "or any other participant in the PSNS market has ever competed by paying users." 1-ER-18–19. That requires reversal of the district court's exclusion order and vacatur of the grant of summary judgment to Meta. *See, e.g.*, *Teradata*, 124 F.4th at 567–68, 573–74 (reversing exclusion of expert opinion that was based on a "legally erroneous" view of a "substantive rule of antitrust law," and then vacating summary judgment). Indeed, the existence of evidence that Meta considered paying users in the actual world goes beyond what is required for the but-for world and bolsters, not undermines, Economides' opinions.

## B. The District Court Improperly Usurped The Jury's Role In Resolving Disputed Facts and Inferences At Summary Judgment

Beyond the district court's just-discussed error of law, the court improperly resolved factual disputes concerning Economides' underlying evidence at the summary-judgment stage, leading the court to deem Economides' ultimate opinion "not convincing." 1-ER-18, 20 (order denying class certification, stating "there is simply too great an analytical gap between the facts on which Dr. Economides relies and" his opinion that Meta would compensate PSNS users for their data); *see also* 1-ER-4–5 (summary-judgment order adopting same reasoning).

This, too, was error. This Court's precedents make clear that a district court passing upon the admissibility of an expert opinion at the summary-judgment stage cannot act as factfinder and determine that the expert's underlying evidence is "not

convincing." Instead, where there is a genuine dispute regarding that evidence, the court must allow the jury to consider the expert opinion and evidence at trial. The district court erred both in its understanding of the standard and its application of it to the particular evidence upon which Economides relied.

### 1. The District Court Misunderstood The Standard To Allow The Court To Resolve Disputes Concerning The Expert's Underlying Evidence At The Summary-Judgment Stage

The district court characterized its resolution of factual disputes presented by the underlying evidence as an analysis of whether Economides' opinions were based on "sufficient facts or data" and thus admissible under Federal Rule of Evidence 702(b). 1-ER-16; 1-ER-5. This was error because the fact that a party has moved to exclude an expert's opinion does not permit the district court to resolve disputes concerning the underlying evidence on which an expert relied.

In *Teradata*, for example, the district court excluded the plaintiff's expert's "harm to competition" opinions as "unwarranted" based on the court's disagreement with the expert's assessment of the underlying evidence, and then granted summary judgment to the defendant. *See* 124 F.4th at 563, 571 (describing district-court opinion). This Court vacated, reasoning that the expert had relied on the defendant's own "business documents" and holding that, while "a trier of fact might disagree" with the expert's interpretation of the evidence and resulting opinions, they were "sufficiently plausible" to reach a jury, and "at this stage, it is not our role to

determine the veracity of the expert's conclusions[.]" *Teradata*, 124 F.4th at 571 (cleaned up). Put another way, a district court errs when it excludes an expert's opinion under the "sufficient facts or data" requirement if the opinion "is sufficiently plausible to constitute a competing version of the evidence." *Id.* (cleaned up).

Similarly, in *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004), this Court explained that "[t]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination," *id.* at 1017 n.14 (9th Cir. 2004) (cleaned up). And in *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227 (9th Cir. 2017), this Court reaffirmed that "Rule 702 should be applied with a 'liberal thrust' favoring admission," *id.* at 1232, "shaky" evidence should be attacked through cross-examination rather than exclusion, *id.* at 1237, and "difficult issues" must be left "in the hands of the jury" to decide, *id.*

*Elosu* is not to the contrary and instead is fully consistent with the foregoing precedent. The district court cited *Elosu* to support the court's exclusion of Economides' opinion, asserting that "there is simply too great an analytical gap between the facts on which Dr. Economides relies and his theory of antitrust injury for it to pass muster as reliable and non-speculative." 1-ER-4–5 (citing *Elosu*, 26 F.4th at 1026); 1-ER-16, 18, 20, 22–24 (citing *Elosu*, 26 F.4th at 1020–26). But the district court disregarded that *Elosu* reversed the exclusion of an expert's opinion,

holding that "Rule 702's 'sufficient facts or data' element requires foundation, not corroboration," and whether the expert's "hypothesis" is "corroborated by other evidence on the record … is for the litigants to argue, and for the jury to decide." 26 F.4th at 1019–20, 1023–29. *Elosu* elaborated that a district court "is a gatekeeper, not a fact finder," *id.* at 1020, "may not weigh the expert's conclusions or assume a factfinding role," *id.*, and abuses its discretion when it "weigh[s] the evidence on record," *id.*, "demand[s] corroboration," *id.*, or "select[s] between competing versions of the evidence," *id.* at 1026, because those are "factfinding steps that exceed the court's gatekeeping role," *id.* at 1020.[11]

The district court's out-of-circuit authority does not support its exclusion of Economides. *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77 (1st Cir. 1998) (cited at 1-ER-16, 18, 23), reversed the exclusion of an expert's testimony, explaining that, because there was *some* support for it, "it should be tested by the adversary process" since "a party who proffers expert testimony" need not

---

[11]    *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014) (cited at 1-ER-21, 24), and *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (cited at 1-ER-24), also do not support the district court's exclusion of Economides. *Pomona* reversed a district court's exclusion of an expert, explaining that, so long as there was data that supported the expert's opinion, exclusion is an "abuse of discretion" and whether that data was "too small" or "too limited" is a "matter for the jury." 750 F.3d at 1044, 1046, 1048–49. *Alaska* held that a "district court is not tasked with deciding whether the expert is right or wrong," and it is simply "supposed to screen the jury from unreliable nonsense opinions, … not exclude opinions merely because they are impeachable." 738 F.3d at 969–70.

"prov[e] to the judge that the expert's assessment of the situation is correct," 161 F.3d at 83–85. So too here, as we explain in detail *infra*, reasonable jurors could find the evidence consistent with Economides' rather than the district court's view of the facts.

*Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256 (2d Cir. 2002) (cited at 1-ER-18, 20), affirmed the exclusion of an expert because he "failed to apply his own methodology reliably," *id.* at 267–69. That is *not* an issue the district court found pertinent to Economides' opinions, and indeed *Amorgianos* makes clear, consistent with *Teradata* and the other cases cited above, that "the district court's *Daubert* gatekeeping role does not permit the district court, in ruling on evidentiary sufficiency, to reject admissible expert testimony." 303 F.3d at 267–68.

*Goebel v. Denver & Rio Grande W. R. Co*., 346 F.3d 987 (10th Cir. 2003) (cited at 1-ER-18), held the expert's testimony *admissible* because it had support in the literature, even if "each individual article" did not necessarily "fully support" the expert's "precise theory," *id.* at 992–94. Economides' opinions likewise had support in the literature. *See infra*, Point I.B.4.

In *Cohen v. Cohen*, 125 F.4th 454 (3d Cir. 2025) (cited at 1-ER-16, 20, 23), the court's primary rationale for ordering exclusion of the expert's opinion concerned a deficiency in the expert's "independent qualifications," 125 F.4th at

31

461. But here, even the district court acknowledged that "Dr. Economides is a well-qualified economist[.]" 1-ER-13.[12]

*Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278 (11th Cir. 2022) (cited at 1-ER-21–22), is similarly inapposite because it turned on the expert's qualifications (which were "based on his experience rather than formal education or academics," 47 F.4th 1278 at 1321–22) and the expert's failure to "explain *how* that experience" led to his conclusion, *id.* at 1322 (emphasis in original). Economides is an academic, he relied on economic theory and literature and actual record evidence (not personal experience), and he explained the bases for his opinions.[13]

\* \* \* \* \*

Having discussed the appropriate standard, we now turn to the specific areas of the underlying evidence, which underscores that the district court improperly resolved factual disputes at the summary-judgment stage.

---

[12] *Cohen* is also distinguishable to the extent it faulted the expert's opinion as based solely on "two almost thirty-year-old studies" that were "further weakened by their relatively small sample sizes," 125 F.4th at 462–63. Here, by contrast, Economides relied on much more than two articles (*see* Points I.B.2–4, *infra*), and whether the evidence corroborating an expert's opinion is "too limited" or "too small" goes to weight, not exclusion. *Pomona*, 750 F.3d at 1048–49.

[13] *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092 (11th Cir. 2005) (cited at 1-ER-22), is clearly inapposite because the excluded expert had offered opinions "unsubstantiated by any factual basis," *id* at 1111, whereas Economides here relied on substantial record evidence and the only issue was that the district court disagreed with Economides' interpretation of that evidence.

### 2. Evidence That Meta Considered Paying Facebook Users For Their Data

████████████████ As noted in the Introduction, *supra*, at 3, Meta's

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████ 4-ER-469–70. This ████████████████ proposal is just one example of Meta's serious consideration of paying Facebook users for their data even in the actual world. To the extent the district court deemed this evidence irrelevant because the proposal was never implemented in the actual world, the court erred as a matter of law, *see* Point I.A, *supra*, and it further erred by not considering whether reasonable jurors could find that the seriousness of the proposal in the actual world supports an inference that Meta would have *implemented* the proposal in the but-for world.

████████████████████████████████████, which was presented to ████████, contemplated Meta paying Facebook ████████████ for sharing their data with Meta. 4-ER-473, 505, 524–25; 5-ER-824. Users would then ████████████████████████████████████ ████████████████████████████. 4-ER-476, 492, 504, 508. The proposal ████████████████████████████████████ ████████████████████████████ 4-ER-524–25.

33

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ *E.g.*, 5-ER-692; 5-ER-825.  The team

███████████████████████████████████████████

██████ including  a  ████████████████████████████

███████████████████████████████████████ 5-ER-

692–94; 5-ER-825; 4-ER-542 (capitalization in original).

The  district  court  rejected  the  ██████  and  ████████████ examples

because, according to the court, they "concerned user data that Meta could not or did

not already obtain through Facebook's social-networking service."  1-ER-21.  But

evidence showed that both ████████████ and  ██████████ were proposals

about compensating users for data that Meta was *already collecting* from Facebook

users, not new types of data.  As noted above, Meta faced the prospect of ██████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ prompting the need for █████████████████████

████████████████████.  4-ER-535 (emphasis added) (██████

███████████████████████████████████████████

███████████ ); 4-ER-505 (███████████████████████████

34

██████████████████████████████████████████████████████

████████████████████████████████) (emphasis added).  In other words,

rather than Meta potentially losing access to data it had been collecting, Meta would

pay users so they continued providing that same data.

  ***Data dividend***.  This Meta proposal grew out of similar circumstances to the

just-discussed ████████████ and ██████████████, specifically Apple's

announcement of its App Tracking Transparency feature, which limited the ability

of third-party apps like Facebook to collect and use users' data unless the users

consented through a pop-up prompt.  1-ER-22.  To encourage such consent, Meta's

████████████████████████ championed a "data dividend," 5-ER-694–95; 5-ER-

826, that would █████████████████████████████ to incentivize them

to continue providing their data, 4-ER-571.  Meta's ████████████████ was ██

███████████████████ and recognized comparable ███████████████████████

█████████████████████████████████████████████████████

██████████████████. 4-ER-453–54.

  Economides reasoned that Meta's various proposals to pay Facebook users

for access to their data, including this one, demonstrate that Meta, "even in the real

world where it a monopolist," has "repeatedly studied compensating users for their

data[.]"  5-ER-826–27; 5-ER-691.  He explained that this was significant because it

indicated Meta "could and likely would offer that compensation in a but-for world where it faced actual competition." 5-ER-826–27.

Although the district court acknowledged this proposal, it deemed "Economides' analysis of" it "and its relevancy … perfunctory to the point of being of little utility." 1-ER-22. But it is unclear what more Economides could have said. Again, while the district court might disagree, the question is a factual one, and reasonable jurors could agree with Economides.

*     *     *     *     *

The foregoing proposals reached the very highest level of the company:



(capitalization in original).

The district court nonetheless criticized this evidence as "internal trial balloons that never ripened into serious proposals[.]" 1-ER-21. But such weighing of the evidence was for the jury, not the district court. *Clarkson v. Alaska Airlines,*

---

14  For other evidence that the proposals were discussed by high executives, *see, e.g.*, 4-ER-472; 4-ER-532; 4-ER-469; 4-ER-453–54; 4-ER-573.

*Inc.*, 59 F.4th 424, 434 (9th Cir. 2023) (reversing grant of summary judgment because "the judge's function is not to weigh the evidence") (cleaned up); *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 570 (9th Cir. 2022) (similar; faulting district court for finding that there were "far more plausible explanations"); *Chelson v. Oregonian Pub. Co.*, 715 F.2d 1368, 1371–72 (9th Cir. 1983) (similar; as to antitrust injury, what "would have" been done "but for the actions" of defendant were "factual determinations" that "are not for us to make").

Additionally, the district court ignored evidence that plausibly explained why Meta did not ultimately implement the proposals in the actual world and thus why Meta would have implemented them in the but-for world. Economides reasoned that, in the actual world, Meta "did not adopt these proposals *not* because they were infeasible, but instead because … as a monopolist, … it need not pay for users' data that its monopoly power allowed it to take for free." 5-ER-826–27 (emphasis in original).

Reasonable jurors could find that the record supports Economides' view of the evidence. It shows that Meta, in the actual world of suppressed competition, sought to ███████████████████████████████████████████████ ████████████████████████████████ 4-ER-562. According to its own documents, ██████████████████████████████ 4-ER-463, ██████████

███████████████████████████████████████████████

████████ 4-ER-460.[15]

The district court did not acknowledge this evidence or Economides' explanation. This reflects a "gap" of the district court's own "making," requiring reversal. *Elosu*, 26 F.4th at 1027 (a district court "cannot exclude expert testimony for lacking 'sufficient facts or data' while openly disregarding the foundation of the expert's opinion"); *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024) (similar, court improperly "overlooked the data actually relied upon by [expert] in rendering his opinion").

### 3. Evidence That Meta And Other Data Companies Paid Participants In The Market-Research Context

Economides further supported his opinion that Meta would have compensated Facebook users for their data *in the PSNS context in the but-for world* by pointing to evidence that Meta and other well-known companies like Google, Amazon, Comscore, and Nielsen paid participants for similar data *in the market-research context in the actual world*. 5-ER-714–736; 5-ER-823–24, 831–36, 842–48. In the market-research context, the payor does not provide the participant-payee an

---

[15] *See also* 4-ER-439 (Meta's conclusion that ████████████████████ ███████████████████████████████████████████████ ███████████████); 4-ER-442–43 (Meta executive warning of ████████████████████████████████████████████████ ████).

ongoing functional service such as social networking, but instead receives data from the participant-payee and pays her for it. 5-ER-809. The district court improperly discounted this evidence too.

At the outset, this Court and other courts have drawn the same or similar lessons from the market-research context as Economides drew here. In *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020), for example, this Court credited the connection between the "financial value" of Facebook users' "browsing histories" and "research panels that pay participants for access to their browsing histories," 956 F.3d at 600. Similarly, in finding Klein's theory plausible *in this case*, Judge Koh cited evidence that "Facebook itself paid certain users up to $20.00 per month" for their data, 2-ER-154, which was a reference to Meta's own "Research" app, 2-ER-265, one of the same market-research services relied on by Economides, 5-ER-823–24.

In *Brown v. Google, LLC*, Case No. 20-cv-3664, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022), the court declined to exclude as "speculative and unreliable" an expert's opinion that Google owed users $3 per month for data it collected from them in the web-browser context, *id.* at *3–*5. The plaintiffs asserted that Google, through its Chrome web browser, "surreptitiously intercepts and collects users' data[.]" *Id.* at *1, *3. The plaintiffs' expert constructed a damages model based on what Google itself paid other users for comparable data through its "Screenwise"

39

market-research program (another program on which Economides relied).  2022 WL 17961497, at \*3–\*5.  The court rejected the defendant's argument that "the $3 input" the expert "uses is speculative and unreliable," because "[t]he $3 rate is derived from looking at what Google actually pays Screenwise participants" for comparable data, such that the expert's analysis was "logical and reliable."  *Id.* at \*5.  The court later denied summary judgment, recognizing a triable issue whether "there is a market for their data" as "Google itself has piloted a program [Screenwise] where it pays users $3.00[.]"  *Brown v. Google LLC*, 685 F. Supp. 3d 909, 940, 943 (N.D. Cal. 2023).

Another district court reached a similar conclusion in *Rodriguez v. Google LLC*, 772 F. Supp. 3d 1093 (N.D. Cal. 2025).  There, mobile device owners running Google software asserted that Google improperly collected and profited from their data.  *Id.* at 1098–1101.  The defendant sought summary judgment on the plaintiffs' claim that "Google failed to pay for the data it collected despite there being a market for it," which the plaintiffs supported with an expert opinion that relied on payments Google itself made in the market-research context through Screenwise.  *Id.* at 1109–10; Case No. 20-cv-04688 (N.D. Cal.), Dkt. 676 at 935–40 (trial testimony of expert).  The district court denied summary judgment, 772 F. Supp. 3d at 1109–10, and the jury later found for the plaintiffs, Dkt. 670 (jury verdict).

Similarly here, there was ample evidence from which reasonable jurors could find that the market-research context is relevant for drawing inferences in the PSNS

context.  Indeed, the district court did not confront evidence that ███████ ████████████████████████████████████████████████ ████████████████████████. 5-ER-734–735; 5-ER-835–36.

For example, when Meta employees ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. 5-ER-835 (emphasis added).  Similarly, when a Meta team was considering ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████. 4-ER-461 (emphasis added).  And, in evaluating its own market-research programs, ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████. 5-ER-734–35; 5-ER-836.  The district court disregarded this evidence, which is error.  *Elosu*, 26 F.4th at 1027; *Hyer*, 118 F.4th at 1056.

The district court also impermissibly found that the data collected by market-research programs is different from what Meta collected in the PSNS context from

Facebook users. 1-ER-20–22. At the threshold, this reasoning is contradicted—at least reasonable jurors could find—by the fact that, as just explained, Meta itself drew parallels between the market-research and PSNS contexts. Moreover, reasonable jurors could accept Economides' explanation that the data collected in the two contexts is similar. As Economides described, the data the market-research payors collect—web history, app usage, device, location, and ad engagement information—is comparable to the data Meta collects from Facebook users in the PSNS context. 5-ER-732–34; 5-ER-834–35. The district court "overlooked" or "disregarded" this evidence too, which is improper. *See, e.g.*, *Hyer*, 118 F.4th at 1056; *Elosu*, 26 F.4th at 1027.

The district court also faulted Economides for supposedly failing to "explain how or why evidence on these transactions in a wholly different market, where the terms of exchange are different, would be informative of whether Facebook, in the PSNS market, would choose to compete on price[.]" 1-ER-21. But Economides did that too, and reasonable jurors could credit his showing. Specifically, Economides described that, in the but-for world, Meta would be "required to convince Facebook users to accept the collection and use of their data when they have competitive rival PSN Services with better data … policies as options," and the market-research programs illustrate the "effective minimum" that users require to share their data, in return for no additional service functionality, when a company is honest about the

data it collects and uses.  5-ER-836–39; 5-ER-802–05.  While the district court disagreed with Economides' reasoning, reasonable jurors could have agreed, and the district court therefore erred in excluding Economides on that basis.  *See, e.g.*, *Elosu*, 26 F.4th at 1027; *Hyer*, 118 F.4th at 1056; *Teradata*, 124 F.4th at 571.

### 4.  Academic And Governmental Literature Supporting That Greater Competition Can Lead A Service To Pay Users

Economides relied on scholarly articles from economists Mark Armstrong and Bruno Jullien regarding platforms' charging of "negative" fees to users—*i.e.*, paying them—for their usage.  *E.g.*, 5-ER-695–97; 5-ER-822–23 & n.117.  Economides also relied on a paper by Fiona Scott Morton—former chief economist at the Department of Justice's Antitrust Division—explaining that "[i]t is a possible that a digital market has an equilibrium price that is negative" such that "the platform would pay for it[.]" 5-ER-695–97; 5-ER-822–23 & n.119.[16]  And to connect the general point to Meta, Economides cited congressional testimony by Rohit Chopra (former FTC Commissioner and director of the Consumer Financial Protection Bureau) and reports by Jason Furman (former Chair of the White House Council of Economic Advisers) and U.K. governmental authorities—all of which concluded

---

[16]  Ms. Scott Morton later served as an expert for plaintiffs asserting similar antitrust claims against Meta in the United Kingdom.  The United Kingdom court relied in part on Scott Morton's analysis in certifying a class.  2-ER-67–68.

that, in a competitive market, Meta could pay users for their data. 5-ER-679–80 & n.560; 5-ER-822–23 & n.119.

The district court acknowledged Economides' authorities, stating that they are "credible sources" and that Economides' opinions based on them were "not bunkum" as "general concepts[.]" 1-ER-32–35. But the court then ran afoul of its limited gatekeeping role in multiple ways.

*First*, "literature is not required in each and every case." *Wendell*, 858 F.3d at 1237; *see also Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Peer reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be in the literature."). Economides went beyond what is required in citing this literature at all. Accordingly, even if the district court had a sound basis to reject the literature at the summary-judgment stage (it did not, as we show next), that would not support excluding Economides or granting summary judgment to Meta.[17]

*Second*, the district court improperly resolved the persuasiveness of Economides' citations and applied too high a bar. Even while acknowledging Economides' citations as "credible," the court rejected them as "commentary by other observers." 1-ER-17, 19. But "observers" understates that the authors include

---

[17] The district court held without citation that "literature alone is not enough to satisfy FRE 702." 1-ER-19. But Economides did *not* rely on literature alone. *See supra*, Points I.B.2–3.

a former chief economist at the Antitrust Division, a former FTC Commissioner, and a former Chair of the White House Council of Economic Advisers. And regarding the papers' substance, the district court simply declared that some are "far less compelling" than Economides "acknowledges." 1-ER-19. As set forth in Point I.B.1, *supra*, however, "[c]hallenges that go to the weight of the evidence are within the providence of a fact finder, not a trial court judge." *Elosu*, 26 F.4th at 1020, 1024, 1028–29 (cleaned up) (reversing exclusion of expert where district court "weighed the evidence on record").

Further, the district court discounted Economides' sources because they supposedly stated that platforms like Meta "'may' and 'might'" pay and suggested "it is merely *plausible* that the price charged ... would be negative." 1-ER-19–20 (cleaned up) (emphasis in original). But the district court demanded too much. As this Court has explained, "[l]ack of certainty is not … the same thing as guesswork." *Primiano*, 598 F.3d at 565; *see also Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1059–60 (9th Cir. 2003) (cleaned up) (that literature does not "specifically" establish "cause-effect relationship" does not make expert opinion unreliable). Moreover, while the district court suggested that plausibility does not suffice, that is all Rule 702 requires. *Teradata*, 124 F.4th at 571 (reversing exclusion of expert because expert's opinion *was* "sufficiently plausible").

*Third*, the district court improperly inserted itself into a battle between the parties' experts regarding the literature. Economides relied upon sources from economic and governmental authorities. Meta's expert, Dr. Tucker, relied on ███████ of her own regarding ██████████████ *E.g.*, 5-ER-850–51, 853–55; 5-ER-813–14. Each expert also responded to the other's citations regarding these sources. *See, e.g.*, 5-ER-794–95; 5-ER-813–14.

This Court's precedent establishes that, where each side's experts "c[an] find support in the journals and research," "this sort of debate" about "publications" is "the job of the fact finder, not the trial court" to resolve, and thus not a basis for exclusion under *Joiner* (the principal authority on which the district court relied) or other precedent. *Pomona*, 750 F.3d at 1048–49. Yet, the district court incorrectly resolved this battle itself. *See id.* at 750 F.3d at 1048–49 (reversing exclusion where there was "battle of among experts"); *Elosu*, 26 F.4th at 1026, 1028 (in resolving admissibility of expert testimony, district court abuses its discretion when it "select[s] between competing versions of the evidence" and "experts' competing version of events"); *Gila River Indian Cmty. v. Schoubroek*, 145 F.4th 1058, 1086 (9th Cir. 2025) (partially reversing summary judgment; triable issues exist where there is "a battle of the experts").

Finally, even if the district court had been correct to exclude Economides' opinions (it was not), the court erred in holding that this exclusion warranted

granting summary judgment to Meta. 1-ER-7, 9. It is "well-established that a plaintiff may prove antitrust injury without the use of expert evidence." *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 324 n.15 (N.D.N.Y. 2021) (collecting cases). Indeed, requiring expert evidence would be contrary to how this Court approaches other issues in antitrust cases. *See, e.g.*, *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 767–68 (9th Cir. 2001) (party created a triable issue regarding market definition with lay evidence alone).

## II. THE DISTRICT COURT ERRED IN DENYING CLASS CERTIFICATION BASED ON A DEFICIENCY AFFECTING ALL CLASS MEMBERS EQUALLY AND THAT WILL NO LONGER BE A DEFICIENCY IF SUMMARY JUDGMENT IS VACATED

In denying class certification, the district court conflated the standards for certifying a class with the merits of the class's claims. The court did not contest that the ordinary prerequisites for certifying a class—such as the number of members in the proposed class and whether they assert common claims, Fed. R. Civ. P. 23(a)(1)-(2)—were satisfied. Specifically, the court did not question that Klein and every proposed class member relies on a common theory of antitrust injury (and common evidence) that, in a but-for world without Meta's deception, Meta would have paid users for their data. Instead, the court simply stated that Economides' opinions on antitrust injury are "not convincing," the class cannot prove antitrust injury without Economides, and "[t]his is enough to deny certification[.]" 1-ER-20, 26. Confirming that this was simply a merits ruling, the court incorporated this same

reasoning into its later grant of summary judgment to Meta—unquestionably a merits ruling.  1-ER-4–5.

The district court erred in denying class certification based upon its views of the merits of the class's claims.  In *Amgen*, for example, the Supreme Court reiterated that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  568 U.S. at 466.  In *Lytle v. Nutramax Laboratories, Inc*., 114 F.4th 1011 (9th Cir. 2024), this Court likewise explained "[r]equiring that class action plaintiffs actually prove classwide injury at this stage would improperly conflate the class certification inquiry with the merits," *id.* at 1025–26.  The Court similarly held in *Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107 (9th Cir. 2014), that a district court commits "legal error" in "denying class certification" where it "evaluat[es] merits questions, rather than focus[es] on whether the questions presented, whether meritorious or not, were common to members of the putative class," *id.* at 1113–14.

Put another way, "[w]hen, as here, the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification." *Tyson Foods*, 577 U.S. at 457 (cleaned up).

In *Stockwell*, for example, a putative class of police officers asserted discrimination claims. 749 F.3d at 1109. The lower court critiqued their "statistical study purportedly showing a disparate impact" as "inadequate" and denied certification. *Id.* at 1115. This Court reversed, explaining that "whatever the failings of the class's statistical analysis, they affect every class member's claims uniformly … it will be so for all class members or for none; their claims rise and fall together." *Id*. The class's reliance on the study "strengthened, not weakened, the case for certification" as it was a "common question, the resolution of which will uniformly affect all members of the class." *Id.* at 1116.

Here, the proposed class relied on a common theory of antitrust injury supported by a common expert relying on common evidence. The district court purported to base its class certification denial on "commonality and predominance[.]" 1-ER-24–25. But neither lends any support to the district court's approach. *Alcantar v. Hobart Serv*., 800 F.3d 1047, 1053 (9th Cir. 2015) (reversing denial of class certification based on supposed lack "of any evidence demonstrating" a "uniform policy" because "whether class members could actually prevail on the merits of their claims is not a proper inquiry in determining the preliminary question whether common questions exist"); *Lytle*, 114 F.4th at 1026 ("focus of the predominance inquiry is whether the method of proof would apply in common to all class members, not whether the method of proof would or could prevail").

The district court's critique of the common theory and evidence were matters for the summary-judgment stage, not the class-certification stage. Of course, the district court did later grant summary judgment to Meta based on this same critique. As shown in Point I, *supra*, that was erroneous for numerous reasons. If summary judgment and the exclusion of Economides are vacated, there will no longer be a fatal similarity of the class's claims, but instead an opportunity for the class to prove those claims to a jury.

## CONCLUSION

The Court should vacate the district court's grant of summary judgment and denial of class certification and remand for further proceedings in which Economides' antitrust-injury opinions are admitted.

Dated: February 19, 2026                    Respectfully submitted,

By: */s/ Shana E. Scarlett*                    By: */s/ Sanford I. Weisburst*
Shana E. Scarlett                              Sanford I. Weisburst
  shanas@hbsslaw.com                             sandyweisburst@quinnemanuel.com
HAGENS BERMAN SOBOL SHAPIRO LLP                QUINN EMANUEL URQUHART &
715 Hearst Avenue, Suite 202                   SULLIVAN, LLP
Berkeley, CA 94710                             295 Fifth Avenue
(510) 725-3000                                 New York, NY 10016
                                               (212) 849-7000

                                               QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP
                                               Kevin Y. Teruya
                                                 kevinteruya@quinnemanuel.com
                                               Adam B. Wolfson
                                                 adamwolfson@quinnemanuel.com
                                               Brantley I. Pepperman
                                                 brantleypepperman@quinnemanuel.com
                                               865 S. Figueroa Street, 10th Floor
                                               Los Angeles, CA 90017
                                               (213) 443-3000

## **STATEMENT OF RELATED CASES**

Appellants are not aware of any related cases pending before the Court.

By: */s/ Sanford I. Weisburst*
Sanford I. Weisburst

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the attached brief is proportionally spaced, has a typeface of 14 points, and contains 11,987 words (including the 201 words in the image reproduced in the Introduction).

By: *_/s/ Sanford I. Weisburst_*

Sanford I. Weisburst

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2026, I caused a true and correct copy of the foregoing brief to be served by e-mail on counsel for all parties as well as pertinent non-parties whose confidentially-designated information was cited in Appellants' brief and/or excerpts of record, as reflected in the attached service list, including to afford them the opportunity to seek to seal the applicable portions of this brief and Appellants' excerpts of record.

By: */s/ Sanford I. Weisburst*
Sanford I. Weisburst

### <u>SERVICE LIST FOR PLAINTIFFS-APPELLANTS' OPENING BRIEF</u>

| Party/Non-Party | Counsel Name | Counsel Email Address |
|---|---|---|
| Meta Platforms, Inc. (Defendant) | Aaron Panner<br><br>Sonal Mehta | apanner@kellogghansen.com<br><br>sonal.mehta@wilmerhale.com |
| Amazon.com, Inc. | Aaron Ross | aaronrss@amazon.com |
| Centercode, Inc. | Monica Burick<br><br>Chris Hossellman | monica@centercode.com<br><br>hossellman@gmail.com |
| Embee Mobile, Inc. | Brett Feldman | brett.feldman@us.dlapiper.com |
| Flurry LLC | Gregory Doll | gdoll@dollamir.com |
| Google LLC | Amit Gressel | agressel@wsgr.com |
| Luth Research, LLC | Stuart Pardau | stuart@pardaulaw.com |
| Sgrouples Inc. (MeWe) | Gordon Lang | glang@nixonpeabody.com |
| Microsoft Corporation | Amy Ray | amyray@orrick.com |
| Snap Inc. | Rachel Gray | rgray@wsgr.com |
| X. Corp. (Twitter) | Alexandra Farley | afarley@mcguirewoods.com |