**No. 25-6858**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MAXIMILIAN KLEIN, SARAH GRABERT, and RACHEL BANKS KUPCHO,

*Plaintiffs-Appellants*,

*v.*

META PLATFORMS, INC., FKA: Facebook, Inc.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California, No. 3:20-CV-08570-JD (Donato, J.)

## BRIEF FOR APPELLEE
## REDACTED VERSION FILED PUBLICLY

DAVID Z. GRINGER
PAUL VANDERSLICE
ALEX W. MILLER
TOM SCHNOOR
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800

AARON M. PANNER
ALEX A. PARKINSON
KELLOGG, HANSEN, TODD, FIGEL &
   FREDERICK, PLLC
1615 M Street NW, Suite 400
Washington, D.C. 20036
(202) 326-7900

SONAL N. MEHTA
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
(650) 858-6000
Sonal.Mehta@wilmerhale.com

NATHANIEL W. REISINGER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
(202) 663-6000

April 22, 2026

*Counsel for Defendant-Appellee*
*Meta Platforms, Inc.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ....................................................................................... 1

STATEMENT OF ISSUES ON APPEAL ............................................... 6

STATEMENT OF THE CASE ................................................................. 7

    A.    Meta Attracts and Retains Users by Providing Valuable Services for Free ........................................................................ 7

    B.    Meta's Motion to Dismiss Is Granted In Significant Part ................... 8

    C.    The District Court Excluded Economides's Opinion That Meta Would Pay All Users $5, Then Denied Class Certification ............... 10

    D.    The District Court Excluded Economides's Payment Opinion Again, Then Granted Meta Summary Judgment ............................... 15

    E.    Because Economides's Exclusion Was Fatal To Class Certification And Summary Judgment, The District Court Did Not Consider The Numerous Other Deficiencies In Appellants' Case ........................................................................................ 17

SUMMARY OF THE ARGUMENT ...................................................... 17

I.    THE DISTRICT COURT PROPERLY EXCLUDED ECONOMIDES'S SPECULATION THAT META WOULD PAY ALL FACEBOOK USERS $5 A MONTH ................................................................................. 21

    A.    The District Court Applied Settled Daubert And Rule 702 Standards In Rejecting Economides's Proposed Testimony As Unreliable .................................................................................. 22

    B.    Economides's Antitrust Injury Opinion Was Ipse Dixit ...................... 26

        1.    Economides failed to address the absence of real-world evidence and the testimony contradicting his opinion .............. 26

        2.    Economides failed to justify reliance on market-research programs, which provide no value to participants except money. ................................................................................. 31

        3.    Economides failed to explain why rejected brainstorms about providing some users varying amounts of compensation supported uniform payments to all users. .......... 34

4.  The academic literature undercuts Economides's pay-everyone conclusion...........................................................39

C.  Appellants' Imagined Legal Errors Misstate The Decision Below.....................................................................................41

II.  EXCLUDING ECONOMIDES'S ANTITRUST INJURY OPINION ENDS THIS CASE.................................................................................................50

A.  Summary Judgment Followed Exclusion Because Appellants Offered No Other Evidence Of Antitrust Injury ................................50

B.  The District Court Did Not Abuse Its Discretion In Denying Class Certification .............................................................................52

CONCLUSION.................................................................................................55

STATEMENT OF RELATED CASES.................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960
(9th Cir. 2013) ...................................................................................47, 48

*Ambrosio v. Progressive Preferred Insurance Co.*, 154 F.4th 1107
(9th Cir. 2025) ............................................................................................20

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013)....................................................................................52

*Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256
(2d Cir. 2002)..............................................................................................49

*AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273
(N.D.N.Y. 2021) .........................................................................................51

*Carrizosa v. Chiquita Brands International, Inc.*, 47 F.4th 1278
(11th Cir. 2022) ..........................................................................................49

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................20

*City of Pomona v. SQM North America Corp.*, 750 F.3d 1036 (9th Cir.
2014) .....................................................................................................47, 48

*Cohen v. Cohen*, 125 F.4th 454 (3d Cir. 2025).......................................................49

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ......................................................47

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida*,
402 F.3d 1092 (11th Cir. 2005) ..................................................................49

*Daubert v. Merrell Dow Pharmaceuticals Inc.*, 43 F.3d 1311
(9th Cir. 1995) ............................................................................................21

*Diaz v. United States*, 602 U.S. 526 (2024)............................................................21

*Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600 (9th Cir. 2002)..........19, 20, 25, 44

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017 (9th Cir. 2022) .......................44, 46

*Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025) ........................6, 21, 25 47

*FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67 (D.D.C. 2025) .............................9

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ..... 1, 14, 17, 19, 22, 23, 24, 46

*Goebel v. Denver & Rio Grande Western Railroad Co.*, 346 F.3d 987
(10th Cir. 2003) ..............................................................................................49

*Grodzitsky v. American Honda Motor Co., Inc.*, 957 F.3d 979
(9th Cir. 2020) .................................................................................................54

*Hangarter v. Provident Life & Accident Insurance Co.*, 373 F.3d 998
(9th Cir. 2004) .................................................................................................48

*In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589
(9th Cir. 2020) .................................................................................................33

*In re Glumetza Antitrust Litigation*, 2021 WL 1817092
(N.D. Cal. May 6, 2021).............................................................................42, 43

*Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir. 1998)...................................44

*Lytle v. Nutramax Laboratories, Inc.*, 114 F.4th 1011 (9th Cir. 2024) ...................54

*McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir. 1988)...........................23

*New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021), .............................9

*New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023)...........................9

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods
LLC*, 31 F.4th 651 (9th Cir. 2022)...............................................13, 52, 54, 55

*Ollier v. Sweetwater Union High School District*, 768 F.3d 843
(9th Cir. 2014) ...........................................................................................14, 26

*Parth v. Pomona Valley Hospital Medical Center*, 630 F.3d 794
(9th Cir. 2010) .................................................................................................20

*Rodman v. Otsuka America Pharmaceutical, Inc.*, 2021 WL 5850914
(9th Cir. Dec. 9, 2021).....................................................................................22

- iv -

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77 (1st Cir. 1998)................................................................................49

*SAP SE v. Teradata Corp.*, 146 S. Ct. 118 (2025)....................................................43

*Teradata Corp. v. SAP SE,* 124 F.4th 555 (9th Cir. 2024)..........................43, 44, 45

*Times-Picayune Publishing Co. v. United States*, 345 U.S. 594 (1953) .................44

*United States v. Alvarez*, 837 F.2d 1024 (11th Cir. 1988).......................................21

*United States v. Flores*, 901 F.3d 1150 (9th Cir. 2018).............................................21

*United States v. Redlightning*, 624 F.3d 1090 (9th Cir. 2010) ................................23

*United States v. Velazquez*, 125 F.4th 1290 (9th Cir. 2025)....................................20

*United States v. York*, 572 F.3d 415 (7th Cir. 2009) ................................................21

*Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227 (9th Cir. 2017).........................48

*Yonay v. Paramount Pictures Corp.*, 163 F.4th 685 (9th Cir. 2026).......................20

**RULE**

Fed. R. Evid. 702 .................................................................. 13, 19, 21, 22, 42, 44

## INTRODUCTION

No service that competes for user time and attention with content has ever paid users merely for viewing that content. Nor has any advertising-supported platform (newspaper, television, radio, magazine, or website) ever paid users simply to access the platform and receive ads. Despite these undisputed real-world facts, appellants' putative expert, Nicholas Economides, "guaranteed" that but for alleged deceptions about data privacy, Meta would have paid all Facebook users a uniform $5 per month rather than competing by improving its services. The only purported bases for that opinion were market-research programs that needed to pay participants because they otherwise offer nothing users value, rejected musings about compensating a subset of Facebook users for data Meta would not otherwise obtain, and commentary that Economides never connected to the record (and did not support his thesis in any event). The district court thus acted well within its discretion in concluding that there was "'too great an analytical gap between' the facts on which Dr. Economides relie[d]" and his "sweeping extrapolation" that Meta would be "guaranteed" to respond to additional competition by adopting a business model neither it nor any other ad-supported platform has ever contemplated, let alone put into practice. 1-ER-7, 17-18, 23 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). This Court should affirm.

Appellants sought to represent a class of all Facebook users alleging that Meta unlawfully monopolized a purported market for "personal social networking services" ("PSNS") through scattered statements over a twelve-year period about its data-privacy practices. Because Facebook is free, appellants suffered no overcharge or other traditional antitrust injury. Instead, they claimed that they could show an antitrust injury common to every member of the class based solely on Economides's theory that, if Meta had made different statements about its privacy practices, there would have been additional competition in the PSNS market, which would have forced Meta to pay *every* Facebook user, and to pay every user the exact same $5 per month to be on the service.

The district court twice concluded that this opinion reduced to Economides's say-so; it was "without basis," "rest[ed] on guesswork," and, as a result, was unreliable and inadmissible. 1-ER-18; 1-ER-4-7. That decision—reviewed for abuse of discretion—was correct. Appellants could not have demonstrated class-wide harm if Economides had merely opined that, in the but-for world, Meta might have paid some users some amount for some data. So he instead asserted that Meta would have paid *every single user* a *uniform* $5 per month just for using Facebook. But no ad-supported platform (not just Meta) had ever even attempted to compete that way, and Economides had no explanation for why Meta would suddenly be the first. 1-ER-19. Appellants' *own expert*—their second economist, Joseph Farrell—

- 2 -

explained why such payments to users would never work. Paying all users a "negative price" simply for logging on would lead people to misuse Facebook for the cash rather than engaging with content, degrading the service for users and reducing the attractiveness of Facebook to advertisers. *See* 2-SER-245-246. Small wonder that the district court found that Economides had "disregard[ed] reality" in favor of "speculation," 1-ER-20, resulting in a pay-everyone-$5 opinion that was nothing "more than a fanciful application of economic theory untethered to real-world evidence about the alleged PSNS market," 1-ER-19. And once Economides's opinion was excluded, the denial of class certification and grant of summary judgment necessarily followed.

Appellants have little response to the deficiencies the district court identified in Economides's reasoning and barely contest that his exclusion decides this case. Instead, their brief is premised on rulings that do not exist.

*First*, the district court did not hold—"as a matter of law" or otherwise—that Meta's decision not to pay Facebook users in the real world "compels the conclusion that Meta would not have paid users in the *but-for world*." Br.4-5 (emphasis in original). The court instead properly considered the absence of evidence that *any* firm had even attempted such a strategy to be a "red flag" that Economides failed to address in his analysis. To use appellants' analogy (at 24), it makes sense to assert that a chain of gas stations would lower prices in the face of competition, because

that is how gas stations compete. It does not make sense to assert that the chain would, in the but-for world, add live rock music performances to all its locations. But that is exactly the sort of unsupported speculation appellants now claim the district court was compelled to allow into evidence.

*Second*, the district court did not make "findings of fact at the summary-judgment stage." Br.5. The court evaluated the materials Economides cited to determine whether they fit his pay-everyone-$5 opinion, then correctly found that none—taken as true—came close to supporting the fundamental and unprecedented transformation that Economides was proposing. Economides primarily relied on market-research programs in which select participants were paid to provide data without receiving any of the value (like engaging content and opportunities for connection) that services like Facebook offer. Economides admitted these differences, and the court noted that he never "explain[ed] how or why evidence of these transactions in a wholly different market, where the terms of exchange are different, would be informative of whether Facebook, in the PSNS market, would choose to compete on price as opposed to quality." 1-ER-21. That observation, based on differences Economides conceded and gaps in his analysis, did not depend on finding facts.

Appellants now focus on Meta's internal documents, but there the district court noted only what is undisputed. All references to potential compensation were

"internal trial balloons that never ripened into serious proposals or an actual practice." 1-ER-21. Critically, even if credited, each contemplated compensating only *subsets* of users—often with points, not cash, and based on usage—for data that Facebook did not otherwise obtain. *Id.* None would have paid everyone with a Facebook account merely for using Facebook. *Id.* And none supported Economides's claim that the absence of competition was why Meta never even experimented with paying all users, as opposed to that idea being (as Meta executives testified) "crazy," 2-SER-289-290. The district court's decision thus properly evaluated the reliability of Economides's analysis of undisputed facts, rather than resolving disputes over the meaning of these documents.

The district court's determination that Economides failed to "reliably appl[y]" economic literature "to the facts of this case" likewise involved no findings of fact. 1-ER-19. As the court held, Economides's "literature" was (at best) commentary about the theoretical possibility of paying people to use a service that Economides never connected to the record. 1-ER-19. And even setting that aside, ███████

█████████████████████████████████████

█████████████████████████████████████

████████████ 2-SER-142-143.

For these reasons, Economides's pronouncement of payment was not grounded in the record or reliable analysis. "The district court cannot abdicate its

role as gatekeeper," under Rule 702, "nor delegat[e] that role to the jury." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) (alteration in original). In carefully evaluating the foundation Economides offered for his opinion and finding his assertion that Meta would have abandoned competition on quality in favor of uniform payments to all users to be inadmissible *ipse dixit*, the district court properly carried out that screening function under the federal rules. This Court should affirm.[1]

## STATEMENT OF ISSUES ON APPEAL

1. Whether the district court abused its discretion by excluding as unreliable appellants' expert's opinion that, in a hypothetical but-for world, Meta—unlike any comparable service ever—would have competed by offering everyone who used Facebook $5 a month instead of continuing to innovate and improve its services.

2. Whether the district court properly granted summary judgment to Meta when appellants' only evidence of antitrust injury was excluded as unreliable.

3. Whether the district court properly denied class certification after appellants failed to provide a common method to prove class-wide antitrust injury.

---

[1] All emphasis and alterations are added and internal quotation marks omitted unless otherwise noted.

## STATEMENT OF THE CASE

**A.** **Meta Attracts and Retains Users by Providing Valuable Services for Free**

Facebook offers its users valued features and engaging content to compete against numerous other online platforms that seek those users' time and attention. Meta provides Facebook for free because its business model largely turns on selling advertising, and the need to attract and retain users to view the advertisements it sells incentivizes Meta to continually improve its services. 2-SER-258-259 ¶¶20-21. This business model—providing engaging content to users and selling advertising—is not new; it began with ad-supported newspapers nearly four hundred years ago and continues to be used by news services, television stations, radio stations, and magazines, among others. A variety of online platforms (such as Snapchat, TikTok, YouTube, X, and many more) likewise make money by attracting users with content and selling advertising. 2-SER-259-260 ¶22. Many more platforms, including Myspace and Google+, have tried. 5-ER-669-674 ¶¶200-207. But all agree that no online service—and no ad-supported content provider in history—has ever competed, much less successfully competed, by paying users to consume content. 2-SER-268; 2-SER-242. Instead, users spend time on platforms like Facebook because they enjoy the content and features that the service offers. 2-SER-258-259 ¶20. Advertisers then pay to show those users advertisements, and pay more

(on Facebook, through an auction) to reach the users who are most likely to engage with their ads. 2-SER-258-261 ¶¶20, 23.

Facebook has more than 200 million registered users in the United States. 2-SER-253-254 ¶39. Some use the service for hours each week and click on advertising frequently. 2-SER-184-185 ¶49; 2-SER-187-189 ¶¶53-54. Others may not have logged on to the service for days, weeks, months, or even years. Because Meta makes money by selling advertising, a user who spends time on the service and views many ads accounts for far more revenue than a user who spends little time and thus views few ads, who may generate little or no revenue. 2-SER-183-184 ¶48; 2-SER-187-189 ¶¶ 53-54. And people change: a user may spend many hours per week on Facebook one year (or one month) and just minutes a few years (or months) later, significantly affecting the revenue attributable to that user over time. 2-SER-262 ¶54.

## B. Meta's Motion to Dismiss Is Granted In Significant Part

Appellants are three Facebook users who sought to represent a class of "all persons in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action." 2-ER-275-276 ¶248. They allege that Meta violated Section 2 of the Sherman Act by acquiring and maintaining monopoly power in a "PSNS" market. They define that market to include aspects of Facebook, Instagram, Google+, Snapchat, and MeWe from 2016 to 2020, █████

- 8 -

███████████████████████ 5-ER-819 ¶18; 2-SER-192-193 ¶18; 2-SER-194-196 ¶¶ 56-59.  As with much of their complaint, appellants' market definition attempts to piggy-back on the now-failed efforts of the FTC and the States to sue Meta for supposed Section 2 violations.  *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 13-14 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023); *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 76 (D.D.C. 2025), *appeal pending*, No. 26-5028 (D.C. Cir.).[2]

Appellants originally claimed Meta violated Section 2 in two distinct ways. One theory alleged that Meta sought to defeat competing PSNS providers (or potential competitors) by copying rival apps' features, acquiring and growing Instagram and WhatsApp, and "kill[ing]" other services, mostly by denying them distribution on Facebook's platform.  2-ER-244-260 ¶¶158-208; 2-ER-279-286 ¶¶260-307.  This "Copy, Acquire, Kill" theory mirrored allegations in the States' suit that were dismissed as untimely and legally unfounded, a decision that the D.C. Circuit affirmed.  *See Meta Platforms, Inc.*, 66 F.4th 288.  Here too, the district court dismissed appellants' Copy, Acquire, Kill theory as untimely.  2-ER-175-179; 2-

---

[2] Following a bench trial, the district court in *FTC v. Meta Platforms, Inc.* held that TikTok and YouTube belonged in the relevant "personal social networking" market, along with Facebook, Instagram, Snapchat and MeWe.  811 F. Supp. 3d at 116-117, 119-123.  The district court also held that Facebook does not hold monopoly power in a properly defined market.  *Id.* at 123.

ER-194. The court provided leave to amend this aspect of their complaint, but appellants did not, 1-SER-20, and they have not appealed its dismissal.

Appellants alternatively alleged that Meta gained and maintained a supposed PSNS monopoly by making misrepresentations about its privacy practices. 2-ER-228-239 ¶¶101-140; 2-ER-279-286 ¶¶260-307. According to the complaint, users make decisions about which social platforms to use based on data privacy, and Meta deceived users into joining or remaining on Facebook by representing that its privacy practices were better than they really were. 2-ER-228-230 ¶¶101-112. The district court allowed this theory to proceed to discovery. 2-ER-125-156. As to antitrust injury, the court did not address appellants' current theory that Meta would have paid all Facebook users $5 a month; it held that appellants had plausibly alleged that Meta "harmed users because, without competition, Facebook can extract additional 'personal information and attention' from users." 2-ER-152 (citing 2-ER-263-264 ¶¶220-222).[3]

### C.  The District Court Excluded Economides's Opinion That Meta Would Pay All Users $5, Then Denied Class Certification

1.    Following extensive discovery, appellants moved to certify a class on a single theory of antitrust injury: absent the claimed deception, competition would

---

[3] Appellants also brought an unjust enrichment claim under California law premised on the same conduct as their Copy, Acquire, Kill and data privacy theories. 2-ER-286-287 ¶¶308-317. The district court dismissed the claim; plaintiffs did not attempt to re-plead it, and they have not appealed that ruling. 2-ER-193-194; 1-SER-20.

have led Meta to pay every Facebook user $5 a month *instead of* improving its services. 1-ER-13; 2-SER-224. To support that theory, appellants relied exclusively on Economides's testimony that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 5-ER-820 ¶61. Economides did not apply any economic or scientific methodology in reaching that opinion. Instead, he based it on analogies to: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ 5-ER-820-828 ¶¶60-83.

Economides was deposed twice: first in connection with his class certification report and, six months later, in connection with his merits report. At the initial deposition, he admitted that he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 2-SER-268-269 (▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Asked again at his second deposition, he confirmed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. 2-SER-242 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- 11 -



).  Economides then disclaimed any antitrust injury other than lack of monetary payment, testifying that it was ██████ ████████████████████ 2-SER-267.  Instead, Facebook would ████████ ████████████████████████████ 2-SER-267; 2-SER-270-271.[4]

Meta moved to exclude Economides's injury opinion, arguing that his assertion that Meta would have paid every user $5 a month for using Facebook rested on speculation rather than any reliable methodology.  2-SER-139-145.  Meta explained that Economides's market-research examples bore no resemblance to how users engage with PSNS services; that Economides failed to explain how rejected internal brainstorming about compensation to some users for extra data supported his view that different competitive conditions would lead to uniform payments to all users; and that Economides could not connect economic commentary speculating that markets could theoretically reach "negative" prices for some participants with

---

[4] The district court limited both plaintiffs and Meta to one expert at class certification, so Economides was the only expert on whom plaintiffs' bid for class certification relied.  2-ER-84.

his pay-everyone opinion in light of the undisputed evidence that no ad-supported service had ever competed that way.

Meta also opposed class certification. As relevant here, Meta argued that Economides's opinion that every user would get the same $5 was appellants' sole basis for proving class-wide antitrust injury and, absent that opinion, plaintiffs had no evidence of any alleged harm that could be established through common proof. 2-SER-164-168. Meta relied on appellants' repeated confirmation that Economides's opinion was essential to their ability to prove class-wide harm. As they had asserted, "the relevant question for class certification is simply 'whether each member of the class can rely on [the expert's] model to show antitrust impact,'" and that the "answer here is yes, because *Dr. Economides' analysis* is market-wide, applies equally to all consumers, and shows Facebook's anticompetitive deception harmed each class member." 2-SER-234-235 (alteration in original) (quoting *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 679 (9th Cir. 2022)).

2. After argument, the district court granted Meta's motion to exclude Economides's antitrust injury opinion. The court noted that appellants bore the burden of proving that Economides's testimony was "'based on sufficient facts or data,'" "'the product of reliable principles and methods,'" and "'a reliable application of the principles and methods to the facts of the case.'" 1-ER-15 (quoting

- 13 -

Fed. R. Evid. 702(b)-(d)). It then explained that under Ninth Circuit precedent, an "expert's opinions are 'inherently unreliable' if they do not rest on a sufficient factual foundation and are 'speculative.'" 1-ER-15 (quoting *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014)). Applying those principles, it determined there was "'too great an analytical gap between' the facts on which Dr. Economides relies" and a necessary step in his reasoning—the assertion that, faced with greater competition, Meta would have responded by paying all users a flat monthly rate rather than competing on quality. 1-ER-17-18 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

As the district court explained, none of the materials Economides's offered to support his prediction of uniform payments said anything about whether "Meta would be compelled to retain users by paying them, rather than through innovations in services and product quality," 1-ER-23-24, and the inferences necessary to his conclusion "rest[ed] on guesswork," 1-ER-18. The court emphasized that this "shortfall goes beyond merely ignoring evidence that Meta in the real world has consistently competed on the basis of quality …. It goes to the very heart of Dr. Economides's theory of antitrust injury to the putative class of users." 1-ER-23-24. Given that Economides's opinion was thus "a conclusion of fiat rather than evidence," the court granted Meta's motion to exclude it. 1-ER-24.

- 14 -

3.       The exclusion of Economides's injury opinion made "relatively short work" of appellants' motion for class certification.  1-ER-24.  The court reasoned that "[p]laintiffs do not dispute that admissible expert testimony is essential to their ability to prove antitrust injury on a class-wide basis here, especially for an overcharge theory of the sort they advance, and that they rely entirely on Dr. Economides."  1-ER-26.  The exclusion of Economides thus left appellants with no means for proving class-wide antitrust injury, and the court denied certification.  *Id.*  It accordingly did not reach Meta's additional arguments to support both excluding Economides and denying class certification.

Appellants then petitioned for Rule 23(f) review, asserting many of the same arguments they do here to argue that the district court's decision was "manifestly erroneous."  2-SER-96-103.  They further argued that the district court's decision "sound[ed] the death knell for [appellants]' case because it excludes Professor Economides' opinions."  2-SER-103.  This Court denied the petition.  1-SER-2-3.

### D.       The District Court Excluded Economides's Payment Opinion Again, Then Granted Meta Summary Judgment

After class certification and interlocutory review were denied, Meta moved to exclude Economides from trial and for summary judgment.  Meta demonstrated that Economides's injury opinion at the merits stage was identical to the one the court had already excluded at class certification and inadmissible for the same reasons.  2-SER-71-73.  Proceeding on Economides's theory with the individual plaintiffs'

- 15 -

claims, moreover, was especially unwarranted because each had testified at their deposition that ████████████████████████████████████ ████████████████████████████████. 2-SER-72; 2-SER-300-301; 2-SER-295-296. Because appellants continued to rely *only* on Economides to prove antitrust injury, the (continued) unreliability of his opinion meant they could not substantiate a necessary element of their claim. 2-SER-41. That warranted summary judgment. *Id.*

Incorporating its earlier analysis, the court observed that Economides's "full-length merits reports" did not cure the previously identified gaps. 1-ER-6. The district court dismissed appellants' attempt to rely on a new injury theory—previously disclaimed by appellants, explicitly rejected by Economides, and now abandoned on appeal—that Meta would have "offered better services" to users in the but-for world. *Id.* After "a deep dive into Dr. Economides' opinions," the court explained that his injury opinion "consisted entirely of the theory that Meta would have paid Facebook users," and was materially the same as the one excluded at class certification. *Id.*

The exclusion of Economides "gut[ted] [appellants]' case." 1-ER-9. While the district court understood that "the absence of admissible expert testimony by an economist does not automatically foreclose an antitrust claim," here the only "lay evidence" appellants had offered was the same "raw material that Dr. Economides

- 16 -

reviewed for his reports." *Id.* That evidence, the district court held, "would not allow a jury to make a non-speculative finding of antitrust injury any more than it allowed Dr. Economides to so opine." 1-ER-10. Because appellants thus could not prove an antitrust injury at trial, the district court granted summary judgment without reaching Facebook's alternative arguments. *Id.*

E. **Because Economides's Exclusion Was Fatal To Class Certification And Summary Judgment, The District Court Did Not Consider The Numerous Other Deficiencies In Appellants' Case**

As the district court explained, and appellants conceded, exclusion of Economides's pay-every-user-$5 opinion sounded the death knell for their case. *Supra* p.15. The court accordingly did not reach numerous other bases asserted by Meta that would independently support excluding Economides's testimony, denying class certification, and granting summary judgment. Contrary to appellants' suggestion (at 6), all of these issues would need to be resolved on any remand before the case could proceed to trial.

## SUMMARY OF THE ARGUMENT

I. Economides's speculation that Facebook would be the first ad-supported platform ever to pay all of its users the same amount in perpetuity for accessing the service left "simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In reaching that conclusion, the district court properly evaluated whether the materials

- 17 -

that Economides relied on provided an adequate foundation for his opinion. It then found that no valid economics or other methodology connected what Economides cited to his pronouncement that greater competition would have induced Meta to make uniform payments to users—rendering the opinion mere *ipse dixit*. The district court thus properly performed its "gatekeeper" role under Rule 702; it did not abuse its discretion in excluding Economides's antitrust injury opinion as nothing "more than a fanciful application of economic theory untethered to real-world evidence about the alleged PSNS market." 1-ER-19.

As they did before the district court, appellants seek to salvage Economides's opinion by pointing to market-research programs that paid small groups of participants because they offered no services; internal company documents hypothesizing non-uniform compensation for enhanced data access (something Meta never implemented); and academic commentary contemplating the possibility of negative-price markets that Economides failed to connect to the facts of this case. The district court acted squarely within its discretion when it held that these materials provided no reliable basis for Economides's conclusion that Meta would choose equal payments to all instead of competing on quality as it (and all comparable content providers) always had. Economides had no explanation other than his personal "guarantee" for his assertion that increased competition would induce Meta to adopt such an unprecedented and irrational business model. Appellants thus

cannot remedy Economides's failure to support "every necessary link" in his theory for how competition would translate to equal payments to all users, 1-ER-5 (quoting *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002)), and show no abuse of discretion.

Unable to defend Economides's opinion on the merits, appellants are left to conjure legal errors the district court did not make. The district court never held "as a matter of law" that appellants "had to adduce evidence of Meta paying Facebook users in the actual world," Br.23, nor "improperly resolved factual disputes concerning Economides' underlying evidence at the summary-judgment stage." Br.27. Applying binding precedent, the court looked to Economides's explanation for why the materials he cited supported universal $5 payments and found that he left "too great an analytical gap between the data and the opinion proffered." 1-ER-16 (quoting *Joiner*, 522 U.S. at 146). That screening function is exactly what Rule 702 requires.

II. Because Economides's opinion was appellants' only evidence of antitrust injury, its exclusion was fatal to their case and required summary judgment. As appellants concede, affirming that ruling ends this litigation, and the Court need not reach their class certification arguments. Br.50. In all events, the district court was right that without Economides's testimony that every user would be paid the same amount, appellants could not prove antitrust injury on a class-wide basis.

- 19 -

## STANDARD OF REVIEW

The district court's decision to exclude Economides under Federal Rule of Evidence 702 is reviewed for abuse of discretion. *Yonay v. Paramount Pictures Corp.*, 163 F.4th 685, 698 (9th Cir. 2026). That is true "even when the ruling[] determine[s] the outcome of a motion for summary judgment," *Domingo*, 289 F.3d at 605. Abuse of discretion review is a "significantly deferential test that looks to whether the district court reaches a result that is illogical, implausible, or without support in inferences that may be drawn from the record." *United States v. Velazquez*, 125 F.4th 1290, 1293 (9th Cir. 2025) (alteration in original). Denial of class certification is also reviewed for abuse of discretion. *Ambrosio v. Progressive Preferred Ins. Co.*, 154 F.4th 1107, 1109 (9th Cir. 2025).

A district court's grant of summary judgment is reviewed de novo, *Yonay*, 163 F.4th at 692, and appropriate when a party "fails to … establish the existence of an element essential to that party's case," *Parth v. Pomona Valley Hospital Medical Center*, 630 F.3d 794, 798-799 (9th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ARGUMENT

**I. THE DISTRICT COURT PROPERLY EXCLUDED ECONOMIDES'S SPECULATION THAT META WOULD PAY ALL FACEBOOK USERS $5 A MONTH**

In excluding Economides's pay-everyone opinion, the district court carried out its gatekeeping function in the manner required by this Court and the Supreme Court under Rule 702. Appellants' arguments notwithstanding, district courts "cannot abdicate" that role nor "delegate … to the jury" their "responsibility to screen expert testimony." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050-1051 (9th Cir. 2025). That is because "*Daubert* is meant to protect juries from being swayed by dubious scientific testimony," *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018), and jurors may "give greater weight to the testimony of an expert because of the court's acceptance of the witness as an expert," *United States v. Alvarez*, 837 F.2d 1024, 1030 (11th Cir. 1988); *see also Diaz v. United States*, 602 U.S. 526, 541 (2024) (Jackson, J., concurring) ("[T]here are serious and well-known risks of overreliance on expert testimony[.]"); *United States v. York*, 572 F.3d 415, 425 (7th Cir. 2009) ("jury might be smitten by an expert's aura of special reliability"). Such concerns are heightened in cases, like this one, where an expert does not apply any scientific methodology or accepted model, and instead relies only on his subjective impressions of cherry-picked documents. *Cf. Daubert v. Merrell Dow Pharms. Inc.*, 43 F.3d 1311, 1315-1316 (9th Cir. 1995) ("[S]omething doesn't become 'scientific

- 21 -

knowledge' just because it's uttered by a scientist."). Thoroughly evaluating Economides's reasoning to protect the jury from *ipse dixit* veiled as expert testimony was sound; it was not an abuse of discretion.

### A. The District Court Applied Settled *Daubert* And Rule 702 Standards In Rejecting Economides's Proposed Testimony As Unreliable

Without any historical precedent or economic analysis, Economides asserted that ███████████████████████████████████████████████████ ████████████████████████████████. 5-ER-820 ¶¶60-61. But opining on the but-for world is not a license for fantasy—Rule 702 and *Daubert* require the party offering an expert to prove that "'it is more likely than not'" that the expert's "'testimony is based on sufficient facts or data,' 'the testimony is the product of reliable principles and methods,' and 'the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.'" 1-ER-15 (quoting Fed. R. Evid. 702(b)-(d)). As a result, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146 (emphasis in original). And when, as here, "there is simply too great an analytical gap between the data and the opinion proffered," exclusion is the proper remedy. *Id.*; *see also, e.g., Rodman v. Otsuka Am. Pharm., Inc.*, 2021 WL 5850914, at *1 (9th Cir. Dec. 9, 2021) ("Because [the expert] did not have reliable evidence

to support her opinion, the district court appropriately excluded her testimony under *Daubert*."); *United States v. Redlightning*, 624 F.3d 1090, 1115 (9th Cir. 2010) ("[T]he district court did not abuse its discretion in determining that there was no reliable evidence in the record to support [the expert's] theory."); *cf. McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (affirming exclusion of opinion that "rests on unsupported assumptions" and "has scant basis in the record").

*Joiner* illustrates the validity of the district court's approach. That decision affirmed the exclusion of expert testimony under *Daubert* when the experts' opinions were "nothing more than speculation" and left "too great an analytical gap between the data and the opinion proffered." 522 U.S. at 143, 146. Those experts had sought to testify that an individual's exposure to certain chemicals contributed to his cancer. *Id.* at 144. But they based this conclusion on "far-removed animal studies" in which "infant mice … had massive doses" of the chemicals "injected directly into their … stomachs," causing "alveologenic adenomas," and conceded that there was no real-world evidence the chemicals had caused "cancer in any other species." *Id.* The plaintiff, in contrast, was an "adult human being" who "had come into contact generally" with "a much smaller … concentration" of the chemicals, and had developed "small-cell carcinomas." *Id.* The experts failed to explain how they "could have extrapolated their opinions from these seemingly far-removed animal studies," and Rule 702 gave the district court "discretion to conclude that the

- 23 -

studies upon which … experts relied were not sufficient, whether individually or in combination, to support their conclusions." *Id.* at 144, 146-147. The Supreme Court thus found no error in the district court's conclusion that the "studies were so dissimilar to the facts presented in this litigation" that they could not form "a sufficient basis for the experts' opinions." *Id.* at 144-145.

The district court's exclusion of Economides's testimony relied on the same reasoning approved in *Joiner*. Just as the experts in *Joiner* failed to account for the differences between high-dosage exposure to chemicals in animal experiments and the human plaintiff's lower exposure, Economides failed to explain how it was reasonable to extrapolate from a few "far-removed" brainstorms about compensating only some users for some data to the unprecedented step of paying all users a flat fee simply to maintain a Facebook account. Likewise, the district court here noted Economides's failure to address the distinction between market-research programs (which provide users no value) and companies like Meta that provide their users with engaging content and enjoyable features, and recognized that he thus could not explain why payment in the one context supported his conclusion of payment in the other. And just as the experts in *Joiner* failed to account for the lack of real-world evidence of the causal theory they advanced, Economides could not account for the conceded lack of evidence that any ad-supported platform had ever paid all of its users to consume content. Nor did Economides bridge the gap between the principle

that some useful data may have monetary value in some contexts and the conclusion that Meta would pay all users regardless of whether each user provided useful data at all. None of this involved a judgment as to whether Economides told a less persuasive or plausible story than Meta (at 44-45); the "heart" of Economides's opinion was "without basis, and so rest[ed] on guesswork." 1-ER-17-18.

This Court has also repeatedly affirmed the exclusion of expert testimony without a sufficient factual foundation. As the Court explained just last year, the "district court's responsibility to screen expert testimony encompasses the requirement that expert testimony be based on sufficient facts or data," which "requires foundation." *Engilis*, 151 F.4th at 1051 (internal citation omitted). "The key inquiry is whether an expert had sufficient factual grounds on which to draw conclusions," and conducting that inquiry requires district courts to evaluate "the evidence [the expert] actually considered." *Id.* at 1051-1052. An expert, moreover, "must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and must rely on more than subjective beliefs or unsupported speculation." *Id.* at 1053. Economides had no factual basis for opining that Meta would pay everyone rather than competing by improving Facebook; nor did he justify his claim that Meta would pay all users—even those who barely use the service and never click on ads—the same $5 per month. *Infra* at pp.27-31. It was the opposite of an abuse of discretion for the district court to hold appellants' expert

- 25 -

opinion to the standard this Court has established. *See, e.g.*, *Domingo*, 289 F.3d at 606-607 (affirming exclusion of expert testimony when "the studies" he "cited do not provide support for every necessary link in [the expert's] theory" and his "four propositions do not lead to his conclusion").

**B.      Economides's Antitrust Injury Opinion Was *Ipse Dixit***

**1.      Economides failed to address the absence of real-world evidence and the testimony contradicting his opinion.**

Economides's assertion that ███████████████████████████████████ ████████████████████████████ 5-ER-677 ¶210, ignored the undisputed evidence of how firms in the alleged PSNS market actually operated in the face of additional competition. Such speculation is always unreliable, and the district court did not abuse its discretion in excluding it. *See Ollier*, 768 F.3d at 861.

As explained, Facebook and other platforms that sell ads compete for users by providing content that people want to engage with. *Supra* pp.7-8, 24; 2-SER-266; 2-SER-240-241. When confronted with effective competition for user time and attention, Meta and its rivals have thus invariably responded by attempting to make their own services more engaging. After Snapchat began capturing attention with Stories (images or short video posts that typically disappear), Meta did not respond by offering users $5 per month to keep using Facebook. It instead created its own Stories feature. When TikTok achieved explosive growth with short-form videos and sophisticated algorithmic ranking systems that attracted usage away from

Facebook, Meta responded by creating its own AI-driven short-form video offering called Reels. And Snap and TikTok themselves did not compete with Meta by offering to pay their users. Like Meta, they competed by innovating—as the district court explained, the "undisputed record" demonstrated "that firms in the PSNS market, including Meta, have consistently competed on the axis of quality through better content, functionality, services, and the like to keep users engaged and the stream of user data flowing, even if the firms theoretically could compete on price," (i.e., pay users). 1-ER-19.

Indeed, Economides admitted that ███████████████████████ ████████████████████████████ 2-SER-242 ██████████ ██████████████████ ). Given the number of ad-supported platforms that have attempted to compete over the years—and the rewards that a successful new business model would deliver—the undisputed fact that this approach has never even been attempted demands an explanation. Yet Economides did nothing to address this inconsistency between how he asserted Meta would *necessarily* respond to additional competition and how he admitted it and every other ad-supported service had *actually* done so previously.

Economides then took his *ipse dixit* even farther, guaranteeing not only that Meta would be the first ad-supported platform ever to pay users simply for consuming content, but that Meta would have paid *every* Facebook user the *same*

monthly fee. That opinion was impossible to reconcile with Economides's own assertion that payments in his but-for world "would need to be commensurate with the value of data collection and use to Facebook." 5-ER-837 ¶111. And indeed, when not acting as a paid expert, Economides argued that even in a hypothetical world where platforms paid some users, they would not pay all of them—much less pay all of them the same amount. 1-SER-9. When confronted with that contradiction, Economides could only offer that ████████████████████████ ████████████████████████████████████████████ ███████████████ 2-SER-274-276.

Even setting those inconsistencies aside, paying every user a uniform monthly fee makes no sense. Not all users provide Meta with the same value, or any value. As Economides put it, ██████████████████████████████████ █████████████████████████████████████████ 2-SER-265; 2-SER-249-250. Many users engage with Facebook only sporadically or passively, without generating or engaging with content or interacting with ads. Facebook would have little economic incentive to pay to keep them. But some users create content that attracts more users (and their data) to Facebook, which has significant value to the platform. 2-SER-182 ¶21; 2-SER-186 ¶51. Others help retain users by engaging with materials posted on Facebook. 2-SER-182 ¶21; 2-SER-186-187 ¶52. Still others see and interact with ads, which Meta monetizes through its relationships with

advertisers. 2-SER-187 ¶53. Each of these individualized distinctions changes the value of a particular user to Meta, and the economic incentives to keep them on Facebook.

Economides ███████████████, *see, e.g.*, 2-SER-249-250; 2-SER-277-278 (when users ████████████████████████████████████ ███████); 2-SER-279-280 (comparing users who ██████████████████ ████████████████████████████), and the individual plaintiffs' testimony ██████████, 2-SER-294 (████████████████████); 2-SER-299 (████████ ████████████████████). As a result, even in a hypothetical but-for world with paid users, the amount an economically rational actor like Meta would pay would necessarily vary depending on the value that person brought to Facebook, and many users would receive nothing at all.

Economides's suggestion that a flat monthly fee would simplify execution and "minimize[] any 'gameability' concerns," 5-ER-828 ¶82, likewise ignored both the record and economics. Appellants' other economic expert, Joseph Farrell, explained that ad-supported platforms ██████████████████████████████████ ███████████ 2-SER-255 ¶108. As a result, changes to Facebook that compromise quality threaten Meta's entire business model. So according to Farrell, that means ████████████████████████████████████████████████████████ ████████████████████████████████████. In his words, "[a]t a negative price,

people could take [products] at a negative price and use them for landfill." 1-SER-15; 2-SER-245-246 ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████.

Economides's resort to "gameability" as a justification for uniform payments also runs headlong into the undisputed fact that Meta competes not just (or even primarily) for *users*; it competes with other services for *usage*. Because individuals can "multi-home" across multiple services like Facebook, TikTok, X, Snapchat, and YouTube, attracting or retaining a user can only provide value if the person actually spends time on the platform. *See supra* pp.26-29. But making a flat monthly payment does nothing to encourage the incremental usage that is the focus of real-world competition. Only variable, usage-based compensation could potentially do that, and even Economides explained why those would not work: "Facebook faces the particular concern that users might create inauthentic or otherwise low quality content in order to earn payments … that in turn could have negative externalities on other platform users." 5-ER-720 ¶303.

Farrell and Economides thus themselves explained why it makes perfect sense that Meta would "not want to 'validate [an] approach,'" or "'put a price tag on the

- 30 -

data'" in a way that would encourage these detrimental effects. Br.37-38. Economides ignored or dismissed this contradictory testimony and the undisputed real-world evidence of how ad-supported platforms compete online. The district court properly relied on this analytical gap in excluding his opinion.

2. **Economides failed to justify reliance on market-research programs, which provide no value to participants except money.**

Casting aside the lack of evidence and economic irrationality of his plan, in his reports Economides primarily relied on market-research programs to support the notion that some services pay users for their data. But Economides conceded that market-research programs are fundamentally different from Facebook because they do not offer engaging content or functions. They offer payment to attract (quite limited) participation in market research; the object is to obtain data to which services like Facebook otherwise do not have access. 2-SER-283-286 ¶¶375-384. Two of Economides's programs, for example, ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████ 2-SER-272-273. It makes sense then—including to Economides—that Meta paid participants to provide this data, because Meta ███████████████████

████████████████████████████████████████████

████████ 2-SER-273.

The district court appropriately rejected Economides's assertion that, just because Nielsen pays participants to fill out a survey, Facebook would pay all of its users $5 each month. Unlike Facebook, every market-research program Economides considered (like Nielsen) pays a limited number of people to participate in market research. 2-SER-197-204 ¶104, Appendix A. That is because none is anything like Facebook or any other service that competes to attract users through content (and shows them ads while doing so). No market-research program offers users engaging content or is an ad-supported business. And none offers people a service at all—as appellants concede, "[i]n the market research context, the payor does not provide the participant-payee an ongoing functional service such as social networking, but instead receives data from the participant-payee and pays her for it." Br.38-39. Although faced with these basic differences between market-research programs and ad-supported content platforms, Economides could "not explain how or why evidence of these transactions in a wholly different market" for research, "where the terms of exchange are different, would be informative of" whether Meta would choose to compete via uniform payments to every user "as opposed to quality in the but-for world." 1-ER-21.

- 32 -

Appellants' argument (at 42) that market-research programs "illustrate the 'effective minimum' that users require to share their data, *in return for no additional service functionality*" only confirms the problem. Users of Facebook (and its competitors) receive that additional functionality and far more, which is vital to Meta's ad-supported business model. Users are attracted to join a service like Facebook and choose to spend their time there because of the content and connection it provides, not because they are seeking a small monthly payment. In contrast, the market-research programs Economides considered paid participants *because* they could not compete on the bases available to PSNS firms, like "better content, functionality, services, and the like to keep users engaged and the stream of user data flowing." 1-ER-19.

Appellants' citations (at 39-40) to cases holding that user data has value are similarly inapposite. None considered whether a website or service that never competed by paying users would have started paying all of its users, rather than improving its offerings, in response to competitive pressure. Each decided only that the specific user data at issue had some value. For example, *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020), held that the fact that research panels paid participants was sufficient to allege the appellants' "browsing histories carry financial value" for an unjust enrichment claim challenging the collection of that data. *Id.* at 600-601. But it does not follow from decisions holding

- 33 -

that user data has some value that Meta would have paid every Facebook user a monthly fee to access it instead of, for example, improving the service in the face of additional competition. Moreover, the proposition that user data has economic value undermines, rather than supports, the claim that users would be compensated *the same amount* irrespective of how—and how much—they engage with the Facebook service. Economides (again) offered no answer.

3. **Economides failed to explain why rejected brainstorms about providing some users varying amounts of compensation supported uniform payments to all users.**

Given the problems with Economides's reliance on market-research programs, appellants now focus on a handful of preliminary brainstorms about whether Meta might compensate some users for some data in some circumstances. The district court did not abuse its discretion when it determined that these could not provide a reliable basis for Economides's opinion. 1-ER-21-23. Each of these ideas was rejected—as the district court put it, the thought exercises and preliminary trial balloons that Economides cited were little more than "musings" that "never ripened into serious proposals or an actual practice." 1-ER-21-22. Economides gave no credible justification for why the fact that these "musings" had never made any economic sense would change in response to different competitive conditions, instead offering only speculation about what Meta would or would "not want to" do. 5-ER-826 ¶76.

- 34 -

More importantly, none of the documents Economides cited even considered the critical feature that Economides ████████ would happen in his but-for world: making uniform monetary payments to all Facebook users. 2-SER-267. Take the document appellants rely on more than any other—an email from an employee involved with data protection discussing the concept of "incentivized consent" from which appellants snipped a single bullet. Nothing in that message contemplates paying all users in response to competition from other content-delivery platforms. Rather, the employee's ████████ considered the possibility of compensating users to allow Facebook to ████████████████████

████████████████████████████████

████████████████████████ 4-ER-469-470. ████████████

████████████████████████████████

████████ 4-ER-470. These are the very features—extra data and variable compensation—that Economides said would not exist in his but-for world, and inherent in their inclusion is a recognition that it would be senseless to pay all users a uniform amount for data provided in the normal course. So even overlooking that this lone email describes a ████████████ that went nowhere and was undertaken by someone with no product, sales, or marketing responsibility, there would still be the same "analytical gap" between the tailored characteristics described and Economides's pay-everyone-$5 opinion as existed between the experiments on

- 35 -

infant mice and the "far removed" conclusions about the adult human plaintiff in *Joiner*. *Supra* pp.23-24.

And indeed, Economides's *own work* was at odds with his opinion that documents like this one showed Meta would pay every user the same amount. As he put it, because ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ 2-SER-142; 1-SER-9. One does not have to be a cynic to demand that an expert provide a persuasive explanation for such an about-face. Economides never did so, and nothing he relied on here provided one.

The district court thus properly faulted Economides for failing to bridge the gap between his posited but-for world, the "incentivized consent" email, and others like it. Economides's report described this document as one among several that considered compensating a subset of users for "enriched data." *See* 5-ER-694 ¶244. But he did "not explain how or why an internal discussion about payments to individuals for additional data different from that which those individuals would give in exchange for use of Facebook might be probative of whether Meta would choose to charge a negative price versus improve the services' quality when faced with the potential of losing a user to a competitor." 1-ER-22.

- 36 -

The other documents that appellants and Economides point to as supposed support for his uniform payment regime likewise only undermine that opinion. All of the brainstormed-but-rejected ideas contemplated some type of compensation only for certain behavior beyond mere content consumption (for example, making purchases, posting valuable content, opting into data sharing). The rejected "Project Bluejay" (at 33-34), for example, would have introduced subscriptions (payments *by* users, not *to* users) and awarded ████ to users who made purchases through engagement with ads on Facebook, ████████████████████ ████████████████████████████████████ or as gifts. 4-ER-504. The ████ would not have been ███████████████ ██████████████████████████████████████ ████████████████████████████ 4-ER-508; *see also* 4-ER-512 ██████████████████████████████ ████████████████████).[5]

---

[5] Although appellants cite (at 33) one estimate that Meta would offer "as much as ████████████," it ignores that such ████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████ *See id.*

Appellants' other hypotheticals similarly would have compensated only some users for specified behavior or additional data, making them "just like the market-research programs that involved data outside the scope collected by Facebook." 1-ER-22. "Offsite Signal Loss" (at 33-34), for example, would have allowed users to collect ██████████████████████████████████████████ ████████████████ 4-ER-542. The "Facebook Perks" document relating to a "data dividend" (at 35) likewise only considered ideas to encourage users to ████████ ████████████████████████████████████████████ ████████████████████████████████████████████. 4-ER-571. The "dividend," moreover, would have been ████████████ ████████████████████████████. 4-ER-571 ████████████████ ████████████████████████████████████████████ ████████████████████████████████). And even then, the document foreshadowed the idea's rejection: with any payments, ████████████████ ████████ 4-ER-572. So whether any of these "proposals reached the very highest level of the company," Br.36, does not change that they were rejected for reasons having nothing to do with competition, nor obviate the differences between them and Economides's pay-everyone-$5 regime.

The smattering of additional quotations appellants have assembled (at 36) also cannot remedy that every rejected trial balloon fundamentally differs from

Economides's "guarantee" for the but-for world—once more, none contemplated paying all users the same amount merely for using Facebook. As the district court concluded, Economides needed to explain why these musings—rejected because they were viewed as bad ideas, not because of a lack of competition—could still support his payment scheme despite the differences, and why additional competition would have led Meta to (1) reverse its consistent opposition to compensating users (2) while also for the first time refusing to compete by improving its services. 1-ER-23. Despite having years and numerous reports to do so, Economides never provided this explanation. Instead, he could only resort to his personal ████ that there would be uniform payments while maintaining that Facebook would ████████████████████████████. 2-SER-267; 2-SER-270-271. The district court did not abuse its discretion in concluding that left only "a conclusion of fiat rather than evidence." 1-ER-24.

###### 4. The academic literature undercuts Economides's pay-everyone conclusion.

The district court's treatment of Economides's use of economic literature was not an abuse of discretion. The court did not hold (at 44) that academic literature is always necessary to expert testimony, instead observing that Economides's "citations to economic literature do not demonstrate that the economic principles of zero- and negative-price markets were reliably applied to the facts of this case," and that "Economides' opinions must fit not just the literature but also the facts in the

- 39 -

record." 1-ER-19. Nor did the district court improperly weigh the evidence when observing that the cited sources were not as supportive as Economides claimed. Br.44-45. This statement required no evaluation of competing authorities—only the quoting of the sources themselves. The literature that Economides cited was primarily "commentary by other observers," mere "speculations" about what "'may' and 'might'" occur under other conditions. 1-ER-19-20. None of the sources "support[ed] his specific conclusion" that, rather than compete on quality, Meta would make uniform payments to users. 1-ER-20. Even here, appellants argue that this literature at most suggested Meta "could" pay users in particular circumstances or that such behavior is "possible." Br.43. But it was (again) Economides's responsibility to explain how academic acknowledgement of a possibility could support his guarantee that Facebook would respond to greater competitive pressure *exclusively* by paying every Facebook user, instead of competing in other ways such as improving the quality of its services. He (again) did not.

That leaves appellants' unsupported and untrue assertion that the district court "improperly inserted itself into a battle between the parties' experts regarding the literature." Br. 46. Appellants do not provide a single citation in which the district court relied on competing expert testimony as a basis for excluding Economides's opinion. The district court cited the report of Meta's expert, Dr. Catherine Tucker, only twice: once to demonstrate that the experts *agreed* that "Meta has never

- 40 -

competed in the PSNS market by paying its users," 1-ER-18, and once to demonstrate that while appellants provided no evidence that other PSNS firms had done so, there was undisputed evidence to the contrary, 1-ER-19. Neither indicates the district court chose between competing expert opinions.

### C. Appellants' Imagined Legal Errors Misstate The Decision Below

1. Appellants are wrong that the district court "h[eld] as a matter of law that" they "had to adduce evidence of Meta paying Facebook users in the actual world." Br.23. Appellants cite no portion of the district court's decisions where it required evidence of such real-world payments because it never did. Instead, the court expressly held that the "shortfall" in Economides's work went "*beyond* merely ignoring evidence that Meta in the real world has consistently competed on the basis of quality" rather than by paying users. 1-ER-24. And what concerned the court was not Meta's decision not to pay its users. Rather, it was the undisputed evidence that *no* ad-supported platform had *ever* done so in the real world; no existing or would-be competitor *ever* decided that this was even worth trying. 1-ER-19. Even then, that lack of real-world evidence was not dispositive—although it was "a big red flag for Dr. Economides' theory," 1-ER-19, what made his opinion unreliable was failing to explain why "Facebook would choose" paying everyone instead of competing on quality, 1-ER-20.

- 41 -

Appellants are thus left to infer this supposed "requirement" from the district court's observations that: (1) some at Meta considered compensating some users in some circumstances, but that these internal musings "never ripened into serious proposals" or "an actual practice," and (2) there was no evidence that PSNS firms "ha[d] ever competed by paying users." Br.23, 27, 36 (citing 1-ER-18-19; 1-ER-21). Finding the evidence an expert offers does not support the conclusion he seeks to draw from it is not the same as holding that any particular evidence is required for reliability. Rather, it is the requisite "scrutin[y]" as to "whether [an expert's] principles and methods have been properly applied to the facts of the case." 1-ER-18 (quoting Fed. R. Evid. 702, advisory committee's note to 2000 amendment).

Because the district court did not require appellants to provide evidence of real-world payments, their references to authority distinguishing between the actual and but-for worlds (at 25-26) do not undermine the district court's opinion. For example, they repeatedly emphasize *In re Glumetza Antitrust Litigation*, 2021 WL 1817092 (N.D. Cal. May 6, 2021), for the generic notion that antitrust injury does not *require* evidence of actual-world contemplation of the predicted but-for world. As discussed, the district court here did not hold otherwise.

*Glumetza* instead confirms the appropriateness of the district court's reasoning, recognizing a plaintiff's duty to provide "cogent evidence," "competent evidence," or "adequate evidence" to support a hypothesized but-for world. 2021

WL 1817092, at *13-15. *Glumetza* involved an unlawful "pay for delay" agreement between a branded drug manufacturer and a generic manufacturer named Lupin. *Id.* at *14. The plaintiffs introduced evidence that, in the absence of the unlawful agreement, the generic manufacturer would have entered the market earlier, including evidence that the defendants had promised to protect Lupin from competition from other generic entrants and paid Lupin's attorney's fees in exchange for that delayed entry. *Id.* at *3, *14. There was no dispute that *if* Lupin had entered earlier (as a jury could have found it would have), plaintiffs would have paid less. Economides's but-for world rested on no similar foundation, and the district court properly found that he failed to support his opinion that, with more competition, Meta would have responded by making uniform payments to users—rather than competing, as it always has, by innovating and improving the quality of Facebook. 1-ER-18. The key difference is thus *not* that the court here required actual-world evidence and *Glumetza* did not; what matters is the expert in *Glumetza* relied on evidence that supported plaintiffs' predictions for the but-for world, 2021 WL 1817092, at *13, which Economides failed to do, 1-ER-18.

Appellants' reliance on *Teradata Corp. v. SAP SE* is even further afield. There, this Court found a district court abused its discretion when it excluded expert testimony because it failed to define a relevant market in sufficiently specific or precise terms. 124 F.4th 555, 567 (9th Cir. 2024), *cert. denied*, 146 S. Ct. 118

- 43 -

(2025). That holding "implicitly … reflect[ed]" a "legally erroneous" "substantive rule of antitrust law," because "an antitrust plaintiff need not specify a market by precise 'metes and bounds.'" *Id.* (quoting *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953)). The district court's decision here did not turn on any misapprehension of legal substantive elements of their antitrust claims.

2. Far from making "factual findings" (at 18), the district court recognized that it could not "engage in freeform factfinding," "select between competing versions of the evidence," or "determine the veracity of the expert's conclusions at the admissibility stage." 1-ER-16 (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022)). The district court instead did what it is supposed to do: ensure that sufficient facts and data "support … every necessary link" of an expert's theory, *id.* (quoting *Domingo*, 289 F.3d at 606), and to find in appropriate cases (like this one) that "'too great an analytical gap'" exists between the existing data and the expert's conclusion, *id.* (quoting *Elosu*, 26 F.4th at 1027); *see also Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998) (same). In short, the district court correctly followed Rule 702, which "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." Fed. R. Evid. 702, advisory committee's note to 2023 amendment; *accord* 1-ER-16.

Appellants primarily respond with a misreading of *Teradata*. They argue that the district court could not evaluate what Economides offered as the foundation for

- 44 -

his opinion beyond deciding whether his analysis was "sufficiently plausible." Br.28-29 (quoting *Teradata*, 124 F.4th at 571). But *Teradata* never held that plausibility is the bar for admissibility; it in relevant part faulted the district court for improperly rejecting an expert's assumption on a factual issue in the case that underscored the expert's theory of harm to competition because a reasonable jury could infer that the assumption was correct. 124 F.4th at 571. Here, in contrast, the district court did not disagree that employees at Facebook brainstormed about paying some users, it held instead that those facts could not support Economides' broad pronouncements about what competition might look like in the but-for-world. Put differently, Economides' opinions failed because they were an unreasonable extrapolation from the evidence, not because the district court disputed what the evidence was. When explaining the boundaries of the *Daubert* inquiry, moreover, *Teradata* applied the familiar requirements: it held that an expert's opinion must be "a 'reasonable extrapolation[]' *from the evidence*," courts must assess whether an expert "addressed" purported flaws in his reasoning, "expert testimony must be 'not only relevant, but reliable,'" a court "may 'assess the [expert's] reasoning or methodology,'" and "evidence that 'suffer[s] from serious methodological flaws … can be excluded.'" *Id.* at 566, 571 (alterations and omissions in original). *Teradata* thus does not relieve an expert of the burden to explain his inferences and support his opinion with applicable facts, which follows directly from *Joiner*'s instruction

- 45 -

that courts may exclude expert opinions where there is "simply too great an analytical gap between the data and the opinion proffered." 522 U.S. at 146. That is exactly what the district court did here.

Elosu is also consistent with the district court's decision. That case, like Joiner, affirmed that a "'court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" 26 F.4th at 1026 (quoting Joiner, 522 U.S. at 146). That is what the district court concluded here, and in doing so required only "foundation, not corroboration," Br.30. Appellants' drive-by observation that Elosu reversed the exclusion of the expert makes no attempt to connect the facts or reasoning of that case to this one. In Elosu, an expert fire investigator drew conclusions based on scientific analysis from his observations at the scene of a fire, 26 F.4th at 1026-1027, and the district court improperly rejected the expert's conclusions because they were "contradicted" by other evidence—a decision that this Court found rested on "clearly erroneous" factual conclusions and that "select[ed] between the[] experts' competing versions of events." Id. at 1027-1028. Here, in contrast, the proposed expert—an economist who applied no scientific analysis and had no experience with the industry on which he was pontificating—guaranteed that a firm would adopt a business strategy that no similar firm had ever adopted. Nothing about whether the fire expert in Elosu had sufficient

- 46 -

foundation for his opinion to survive a *Daubert* challenge informs whether Economides did.

Appellants' attempts to preclude any evaluation of the factual bases of an expert's opinion are thus impossible to reconcile with this Court's decisions, not least the instruction that its "caselaw should not be understood to suggest a presumption of admission" of expert testimony because "[t]here is no such presumption." *Engilis*, 151 F.4th at 1050. Those attempts are all the more egregious here, where appellants sought to use Economides's opinion to prove class-wide injury. The law is settled that Rule 23 "does not set forth a mere pleading standard," *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013), and plaintiffs must "prove" that Rule 23's requirements have been met for certification. *Id.*

Appellants' attacks on other cases cited by the district court are more of the same, and show no legal error. The district court cited cases in which experts were improperly excluded or properly admitted because they set forth this Court's standards governing the proper approach to Rule 702's gatekeeping requirement. For example, in *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036 (9th Cir. 2014), after noting that "*Joiner* requires an expert to justify a foundational assumption or refute contrary record evidence," this Court found that the district court had improperly resolved a factual dispute between experts regarding whether a reference database was "too small" when the expert (testifying within the scope of

his expertise) "explained that the database was sufficiently large." *Id.* at 1048. And in *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013), this Court affirmed the district court's decision to admit testimony when the defendant's challenged "the expert's assumptions and comparisons," all of which went to "the weight of the testimony, not its admissibility." *Id.* at 968, 970; *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017-1018, 1017 n.14 (9th Cir. 2004) (affirming district court's rejection of the argument that expert's "selection of documents to review" required exclusion); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1233 (9th Cir. 2017) (holding that, while "it [is] a close question," the district court erred by "look[ing] too narrowly at each individual consideration" ignoring "the experts' experience, reliance on a variety of literature and studies, and review of [the decedent's] medical records and history").

None of these cases suggests that the district court applied an incorrect legal standard, and appellants make no effort to tie this case's record to the errors of the district courts in those cases. When the court here evaluated whether Economides's opinion was reliable, it did not question that Meta sometimes considered the possibility of compensating users for incremental data, the existence of market-research programs that pay users for data, or the possibility of negative price markets as a matter of economic theory. 1-ER-17 ("As general concepts in the economic literature, these propositions are not bunkum."). Its evaluation of these materials

- 48 -

therefore resolved no factual dispute. Instead, the court faulted Economides for failing to explain how any of this evidence, taken as a given, supported his opinion that Meta would, with certainty, have paid every user \$5 if faced with more competition. That opinion was "unreliable nonsense," and properly excluded. *Alaska Rent-A-Car*, 738 F.3d at 969.

Appellants' assertions (at 30-32) about the out-of-circuit cases cited by the district court only bolster the propriety of the district court's analysis. When an expert opinion was "premised on an accepted technique," had "significant support" from relevant scientific literature, and was reasonably based on existing toxicology results about the person to which the opinion was applied, it could not be excluded. *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 84-85 (1st Cir. 1998); *see also Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 994 (10th Cir. 2003) (affirming admission of expert testimony where district court did not "abuse[] its discretion by ruling that [the expert's] opinion was adequately supported by the scientific literature"). But, as here, when an expert's opinion "lacked both the reliability and fit required under Rule 702," it was excluded. *Cohen v. Cohen*, 125 F.4th 454, 461, 464 (3d Cir. 2025); *see also Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 269 (2d Cir. 2002) (excluding opinion that "rested on a faulty assumption due to [expert's] failure to apply his stated methodology reliably to the facts of the case"); *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th

- 49 -

1278, 1322 (11th Cir. 2022) (affirming exclusion of expert opinion where there was "an analytical gap between the data on which [the expert] relied and his ultimate opinion"); *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (affirming exclusion of testimony that was "connected to existing data only by the *ipse dixit* of the expert"). These cases recite and illustrate the applicable standards under binding Supreme Court precedent interpreting Rule 702; the district court properly cited them as informative, and appellants offer nothing to suggest that the district court's decision was out of step with any of them.

## II. EXCLUDING ECONOMIDES'S ANTITRUST INJURY OPINION ENDS THIS CASE

Because appellants relied exclusively on Economides's pay-everyone-equally opinion to substantiate their claimed antitrust injury, concluding that the district court did not abuse its discretion in excluding that opinion suffices to affirm.

### A. Summary Judgment Followed Exclusion Because Appellants Offered No Other Evidence Of Antitrust Injury

Contrary to appellants' argument (at 46-47) the district court correctly held that Economides's speculation was the only evidence appellants had presented of antitrust injury. Appellants say nothing about how they would have proven antitrust injury without Economides, and for good reason—the only claimed harm "is a reduction in the level of compensation that would have been paid to all users," 1-SER-4, and appellants have identified no evidence to substantiate that theory beyond the materials on which Economides relied. Indeed, appellants themselves testified

- 50 -

that ██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ *Supra* pp.15-16. The failure

to identify anything beyond the deficient bases for Economides's opinions is

dispositive. For the same reasons appellants fail to demonstrate that an expert

economist could reasonably reach his pay-everyone-$5 opinion based on those

inapposite materials, they fail to explain how a lay jury could appropriately jump to

the same conclusion based on the same insufficient evidence. As the district court

correctly held, evidence discussed above "would not allow a jury to make a non-

speculative finding of antitrust injury any more than it allowed Dr. Economides to

so opine." 1-ER-10.

As with their other arguments, appellants distort the district court's well-

reasoned opinion. Appellants' failure to prove an antitrust injury on this record

without expert testimony does not mean that the district court held that such evidence

was "requir[ed]." Br.47. On the contrary, it acknowledged the opposite, noting,

"[t]o be sure, the absence of admissible expert testimony by an economist does not

automatically foreclose an antitrust claim." 1-ER-9. And the court still evaluated

summary judgment motion on the merits even after it had already excluded

Economides' testimony. As a result, appellants' assertion that it "is 'well-

established that a plaintiff may prove antitrust injury without the use of expert

evidence,'" Br.47 (quoting *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 324 n.15 (N.D.N.Y. 2021)), gets them nowhere. What matters is whether appellants put forth sufficient evidence for a reasonable jury to reach the conclusion that, in the but-for world, Meta would have responded to increased competition by paying every Facebook user a flat monthly fee instead of improving its services. Appellants' three-sentence aside provides no basis to conclude that a reasonable juror could reach that conclusion.

### B. The District Court Did Not Abuse Its Discretion In Denying Class Certification

Appellants concede that their challenge to the district court's denial of class certification is moot unless "summary judgment and the exclusion of Economides are vacated." Br.50. For the reasons discussed, the Court should affirm those decisions and need not reach this question.

To the extent the Court does consider appellants' arguments on this point, they again misstate the law. Far from "engag[ing] in free-ranging merits inquiries at the certification stage," Br.48 (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)), the district court did exactly what precedent requires: it "ma[de] a 'rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove' the common question in one stroke." *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022) (alteration in original).

- 52 -

Appellants relied solely on Economides's payment opinion to satisfy their burden of showing a common means of proving antitrust injury. They argued that "all users suffered the same harm—a $5 monthly overcharge," 2-SER-214, because in "the but-for world, Facebook would compensate all Class members for their data at a competitive flat rate ($5 per month)," 2-SER-115. They asserted "that the relevant question for class certification is simply 'whether each member of the class can rely on [the expert's] model to show antitrust impact,'" and that the "answer here [wa]s yes, *because Dr. Economides's analysis* is market-wide, applies equally to all consumers, and shows Facebook's anticompetitive deception harmed each class member." 2-SER-234-235 (alteration in original). And they argued at the class certification hearing that "the antitrust injury for the users is a reduction in the level of compensation that would have been paid to all users." 1-SER-5. The district court thus correctly found appellants did "not dispute that admissible expert testimony [was] essential to their ability to prove antitrust injury on a class-wide basis," or that they "rel[ied] entirely on Dr. Economides" to carry that burden at class certification. 1-ER-26.

Accordingly, when Economides's payment opinion was excluded, appellants no longer had any method of proving class-wide injury through common proof. There is nothing unusual about this conclusion. This Court has held not only that the "rigorous analysis" required prior to certification extends to expert testimony,

- 53 -

but also that "[i]n a class proceeding, defendants may challenge the reliability of an expert's evidence under *Daubert*." *Olean*, 31 F.4th at 665 n.7. Such a challenge is permissible because "[i]n carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any *admissible* evidence." *Id.* at 665. Hence, class certification "requires determining whether the expert's methodology is reliable," *Lytle v. Nutramax Laboratories, Inc.*, 114 F.4th 1011, 1031 (9th Cir. 2024)—and expert testimony that is unreliable is inadmissible and thus cannot support certification, *Olean*, 31 F.4th at 665.

This Court affirmed precisely the approach the district court followed here in *Grodzitsky v. American Honda Motor Co., Inc.*, 957 F.3d 979 (9th Cir. 2020). There, as here, the district court excluded as unreliable expert testimony about a required element of the plaintiffs' claims. *Id.* at 981-982. It then denied class certification because "without [the expert's] opinion, the plaintiffs were unable to demonstrate the requisite commonality" as to the required element at issue. *Id.* at 983-984. This Court affirmed, holding that the district court "must ensure that all admitted expert testimony is both relevant and reliable" at class certification, and agreeing that following the exclusion of the expert's defective opinion, plaintiffs "failed to demonstrate commonality." *Id.* at 984, 987.

Appellants' arguments about whether the defects in Economides's injury opinion were "common to all class members" are thus irrelevant. Br.49. This Court

- 54 -

has already held that a plaintiff seeking to represent an antitrust class must present a reliable means of proving injury on a class-wide basis. *Olean*, 31 F.4th at 666. Without Economides, appellants had not. That necessitated denying certification.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ *Sonal N. Mehta*

DAVID Z. GRINGER
PAUL VANDERSLICE
ALEX W. MILLER
TOM SCHNOOR
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800

AARON M. PANNER
ALEX A. PARKINSON
KELLOGG, HANSEN, TODD, FIGEL &
   FREDERICK, PLLC
1615 M Street NW, Suite 400
Washington, D.C. 20036
(202) 326-7900

April 22, 2026

SONAL N. MEHTA
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
(650) 858-6000

NATHANIEL W. REISINGER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
(202) 663-6000

## STATEMENT OF RELATED CASES

Meta is not aware of any related cases pending before the Court.


/s/ Sonal N. Mehta
SONAL N. MEHTA

April 22, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-6858

I am the attorney or self-represented party.

**This brief contains** 12,685 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Sonal N. Mehta **Date** April 22, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of April 2026, I caused my colleague to serve a true and correct copy of the foregoing brief and Supplemental Excerpts of Record, filed with the Court under seal, on the stated persons and email aliases below, pursuant to the parties' consent via File Transfer Protocol:

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Kevin Teruya (kevinteruya@quinnemanuel.com)

Sanford Weisburst (sandyweisburst@quinnemanuel.com)

Adam Wolfson (adamwolfson@quinnemanuel.com)

Brantley Pepperman (brantleypepperman@quinnemanuel.com)

Claire Hausman (clairehausman@quinnemanuel.com)

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Shana Scarlet (shanas@hbsslaw.com)

**LOCKRIDGE GRINDAL NAUEN PLLP**

Brian Clark (bdclark@locklaw.com)

Kyle Pozan (kjpozan@locklaw.com)

I also caused my colleagues to serve via email excerpts of the Supplemental Excerpts of Record Volume 2, filed with the Court under seal, on the stated persons and email aliases below:

| Non-Party | Counsel Name | Counsel Email Address |
|---|---|---|
| Amazon.com, Inc. | Jason Murray | JMurray@crowell.com |
| Centercode | Luke Freiler | luke@centercode.com |
| Embee Mobile, Inc. | Brett Feldman<br>Brian Boyle | brett.feldman@us.dlapiper.com<br>brian.boyle@us.dlapiper.com |
| Google LLC | Amit Gressel<br>Brad Tennis | agressel@wsgr.com<br>btennis@wsgr.com |
| Luth Research, LLC | Stuart Pardau | stuart@pardaulaw.com |
| Sgrouples Inc.(MeWe) | Gordon Lang | glang@nixonpeabody.com |
| Snap Inc. | David O' Neil<br>Nicholas Folly<br>Jeremy Liss | daoneil@debevoise.com<br>nfolly@debevoise.com<br>jiliss@debevoise.com |
| Viant Technology (Myspace) | Jason Murray | JMurray@crowell.com |

/s/ Sonal N. Mehta

SONAL N. MEHTA