**Docket No. 25-6858**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

MAXIMILIAN KLEIN, SARAH GRABERT, and RACHEL BANKS KUPCHO,

*Plaintiffs-Appellants,*

v.

META PLATFORMS, INC., FKA: Facebook, Inc.,

*Defendant-Appellee.*

_____

*Appeal from a Judgment of the United States District Court for the Northern District of California,*
*No. 3:20-cv-08570-JD · Honorable James Donato, District Judge*

## PLAINTIFFS-APPELLANTS' OPENING BRIEF
## REDACTED VERSION – FILED PUBLICLY

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO, LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000 Telephone
shanas@hbsslaw.com

Laya Maheshwari
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100 Telephone
layamaheshwari@quinnemanuel.com

Sanford I. Weisburst
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
295 5th Avenue
New York, NY 10016
(212) 849-7000 Telephone
sandyweisburst@quinnemanuel.com

Kevin Y. Teruya
Adam B. Wolfson
Brantley I. Pepperman
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3673 Telephone
kevinteruya@quinnemanuel.com
adamwolfson@quinnemanuel.com
brantleypepperman@quinnemanuel.com

*Counsel for Plaintiffs-Appellants*
*Maximilian Klein, Sarah Grabert, and Rachel Banks Kupcho*

 

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

ARGUMENT ......................................................................................................4

I. META DOES NOT JUSTIFY THE DISTRICT COURT'S USURPATION OF THE JURY'S ROLE .......................................................4

    A. Meta Does Not Persuasively Defend The District Court's Heavy Reliance On The Absence Of Payments To Users In The Actual World .........................................................................................4

    B. Meta Does Not Justify The District Court's Resolution Of Contested Factual Disputes Under The Guise Of Federal Rule of Evidence 702 .........................................................................................6

        1. Meta's Authorities Do Not Authorize A District Court To Make Findings On Underlying Facts Relevant To An Expert's Opinion .........................................................................8

        2. Meta Does Not Persuasively Refute That Reasonable Jurors Could Rely On Evidence That Meta Considered Paying Facebook Users For Their Data ...................................12

        3. Meta Does Not Persuasively Refute That Reasonable Jurors Could Rely On Evidence That Meta And Other Companies Paid Participants In The Market-Research Context .............................................................................................17

        4. Meta Does Not Persuasively Refute That Reasonable Jurors Could Rely On Academic And Governmental Literature Supporting That Greater Competition Can Lead A Service To Pay Users ...........................................................20

    C. Meta's Remaining Arguments Unpersuasively Seek Affirmance On Grounds The District Court Did Not Reach ...............................20

II. THE PARTIES AGREE THAT THE DISTRICT COURT'S ORDER DENYING CLASS CERTIFICATION, LIKE THE COURT'S ORDER GRANTING SUMMARY JUDGMENT TO META, RESTS ON THE COURT'S EXCLUSION OF PROFESSOR ECONOMIDES' OPINION .............................................................................................26

CONCLUSION ..................................................................................................28

STATEMENT OF RELATED CASES ...............................................................30

CERTIFICATE OF COMPLIANCE ..................................................................31

CERTIFICATE OF SERVICE ...........................................................................32

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bigelow v. RKO Radio Pictures,*
 327 U.S. 251 (1946)......................................................................5, 6, 24, 25

*Brown v. Google LLC,*
 685 F. Supp. 3d 909 (N.D. Cal. 2023)............................................18, 19

*Brown v. Google LLC,*
 Case No. 20-cv-3664, 2022 WL 17961497
 (N.D. Cal. Dec. 12, 2022)................................................................18, 22

*Domingo v. T.K.,*
 289 F.3d 600 (9th Cir. 2002) .............................................................10, 11

*Ellis v. Costco Wholesale Corp.,*
 657 F.3d 970 (9th Cir. 2011) ...................................................................27

*Elosu v. Middlefork Ranch Inc.,*
 26 F.4th 1017 (9th Cir. 2022) ...........................................7, 8, 9, 11, 22

*Engilis v. Monsanto Co.,*
 151 F.4th 1040 (9th Cir. 2025) ...............................................................11

*In re Facebook, Inc. Internet Tracking Litigation,*
 956 F.3d 589 (9th Cir. 2020) ....................................................................19

*General Electric Co. v. Joiner,*
 522 U.S. 136 (1997).....................................................................................10

*In re Glumetza Antitrust Litigation,*
 Case No. 19-cv-05822, 2021 WL 1817092
 (N.D. Cal. May 6, 2021) .........................................................................5, 6

*Grodzitsky v. American Honda Motor Co.,*
 957 F.3d 979 (9th Cir. 2020) ...............................................................27, 28

*Hollis v. R&R Restaurants, Inc.,*
 159 F.4th 677 (9th Cir. 2025) ...................................................................21

*Hyer v. City & Cnty. of Honolulu*,
  118 F.4th 1044 (9th Cir. 2024) ................................................................7, 15

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981)...............................................................3, 6, 24, 25

*Murray* v. *Southern Route Mar. SA*,
  870 F.3d 915 (9th Cir. 2017) ................................................................9

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ................................................................26

*Ollier v. Sweetwater Union High School District*,
  768 F.3d 843 (9th Cir. 2014) ................................................................11

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ................................................................7

*Rodriguez v. Google LLC*,
  772 F. Supp. 3d 1093 (N.D. Cal. 2025).......................................18, 19

*Sali v. Corona Reg'l Med. Ctr.*,
  909 F.3d 996 (9th Cir. 2018) ................................................................26

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931).............................................................................24

*Teradata Corp. v. SAP SE*,
  124 F.4th 555 (9th Cir. 2024) ................................................................8, 9

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016) ................................................................26

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969)..............................................................................24

## Rules

Fed. R. Evid. 702 ..............................................................................6, 8, 19

Fed. R. Evid. 702(b)............................................................................6, 7

Fed. R. Evid. 702(c)............................................................................7

Fed. R. Evid. 702(d)............................................................................7

iv

## INTRODUCTION

Meta's answering brief does not deny that it deceived the market about its data and privacy practices; Meta's own Chief Operating Officer acknowledged Meta was

███████████████████████████████████████████████████

████████████████████████    4-ER-557–58.  Meta also does not contest that, in the but-for world of no deception, it would have faced greater competition from other personal social network service ("PSNS") providers, and would have responded in some way.

In theory, that response could include paying users for their data, improving Meta's service offerings, and/or something else.  Evidence was needed to determine what form the response would take.  Professor Economides evaluated Meta's own documents, among other evidence, and explained that they pointed to Meta paying users for their data.

So, when Meta disputes (*e.g.*, Red Br. 1, 18) Economides' opinion on how Meta would have acted in the but-for world, it raises a factual dispute, not a methodological one.  The district court's order excluding Economides, by its terms, rests on factual findings about contested record evidence—such as whether Meta's internal proposals to pay users were "internal trial balloons that never ripened into serious proposals[.]"  1-ER-21.  These are questions for the jury, not for a district court to resolve in ordering exclusion of an expert opinion.

Consider, for example, the 2019 email from Meta's ████████ ███████████████████████████████████████████████, stating that Meta ████████████████████████████████████ which would ██████████████████████████████ 4-ER-469–70. Suppose this email had been written by Mark Zuckerberg instead of ███. Would the district court have ruled the same way? Clearly not, because the court dismissed the ███ email as insufficiently "serious," 1-ER-21, and a Zuckerberg email would clearly qualify. It is a factual question, not a methodological one, whether ███ email, in ████████████████████ is also "serious" enough. It was therefore for the jury, not the district court, to determine whether this evidence supported a finding that Meta would have paid users for their data in the but-for world. The same is true regarding other Meta proposals that reasonable jurors could find were "serious" because they were presented to Zuckerberg and other Meta executives. *See* Blue Br. 36.

Much of Meta's answering brief does not defend the district court's rationales, but proffers alternative ones. Specifically, while the district court excluded Economides' opinion that Meta would have paid *any* compensation to Facebook users in the but-for world, Meta criticizes Economides' opinion that the payment would have been a "uniform" $5 per month per user. Red Br. 28–34. Even if this Court were inclined to address those issues in the first instance, Meta again simply

raises factual disputes.  For example, Meta falsely accuses Economides of offering "no explanation for why" "Meta would have paid *every single user a uniform* $5 per month[.]"  Red Br. 2 (emphasis in original).  In fact, Economides explained that ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████  2-SER-274–75.  And Meta's former ██████████████████████████ *agreed* that ████████████ ████████████████████████████████████████████████████ ███████████████████  2-SER-183 n.94.  As to whether the fee would be $5: Even if $5 (or Economides' alternatives $3.50 or $6.25) were unsupportable, that would not support summary judgment for Meta, but instead an instruction to the jury to find the appropriate amount.  *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 & n.5 (1981) (recognizing "a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount" (citation omitted)).

At bottom, Meta mischaracterizes this case as one about paying people "just for using Facebook."  Red Br. 2.  Instead, to quote Meta's own employees, it is about ████████████████████████████████████████████████  4-ER-469 (emphasis added); *see also* 4-ER-460–61, 4-ER-571 (similar).  Because Meta does not contest that it misrepresented its data and privacy practices in the actual world, and

3

Economides reasonably interpreted Meta's own documents and other evidence to support the opinion that Meta would have paid Facebook users for their data in the but-for world of truthful disclosure of its data and privacy practices, the district court should not have excluded Economides' opinion, granted summary judgment to Meta, or denied class certification.

## ARGUMENT

### I. META DOES NOT JUSTIFY THE DISTRICT COURT'S USURPATION OF THE JURY'S ROLE

#### A. Meta Does Not Persuasively Defend The District Court's Heavy Reliance On The Absence Of Payments To Users In The Actual World

We argued (Blue Br. 23–27) that the district court erred at the threshold in holding that proof that a defendant would have engaged in a particular response (here, compensating users) in the but-for world must identify evidence that the defendant had already done so in the actual world.

Meta argues that the district court never "held" this "as a matter of law." Red Br. 41 (cleaned up). But several sentences in the court's opinion indicate that the court did rely on the lack of evidence of payment to PSNS users in the actual world. *See, e.g.*, 1-ER-18 ("there is no dispute that Meta has never competed in the PSNS market by paying its users"); 1-ER-19 ("Economides' conclusions about antitrust injury are … untethered to real-world evidence about the alleged PSNS market");

4

*see also* 3-ER-306–07 ("I'm not buying this theory … because it is completely inconsistent with my experience of our online world.").

In any event, even if the district court did not treat payment in the actual world as an absolute prerequisite, the court at least held that the absence of such evidence is a "big red flag for Dr. Economides' theory." 1-ER-19. The court erred by placing such a thumb on the scale in Meta's favor. The Supreme Court employs the opposite presumption: "The most elementary conceptions of justice and public policy require that the wrongdoer"—again, Meta does not deny that it deceived the market regarding its data and privacy practices—"shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

*In re Glumetza Antitrust Litigation*, Case No. 19-cv-05822, 2021 WL 1817092 (N.D. Cal. May 6, 2021) (Alsup, J.), is on point. There, pharmaceutical defendants argued that plaintiffs could not prove the but-for world because there was no evidence that any party in the actual world—"defendants, or their officers, or any third parties"—had "contemplated any of [the] plaintiffs' but-for scenarios." *Id.* at *13. The court disagreed, explaining that "plaintiffs need not show that the [defendant] of our world actually contemplated a given scenario within the but-for world," and the but-for inquiry "requires no speculation" because "[i]t merely asks the jury to project how rational actors in defendants' shoes would have proceeded in

5

the absence of the unlawful [conduct]." *Id.* at \*13–14. The court held that plaintiffs supported their but-for showing with evidence of how the parties had behaved in comparable circumstances. *Id.* at \*13–15.

Meta asserts (Red Br. 43) that Economides lacked comparable record support. Not so. Economides cited the ███, Project Bluejay, Offsite Signal Loss, and Data Dividend proposals. *See* Blue Br. 32–44; *infra*, at 12–16. Meta's distinction of *Glumetza* ignores those documents. The applicable rule, drawn from *Bigelow* and *J. Truett Payne*, and applied by *Glumetza*—and other cases we cited (Blue Br. 26 & n.10) but Meta failed to meaningfully address (Red Br. 42–43)—is that the burden of uncertainty about the but-for world falls on the wrongdoer, not on the consumer plaintiff trying to describe a but-for world the wrongdoer's conduct prevented from existing.

### B. Meta Does Not Justify The District Court's Resolution Of Contested Factual Disputes Under The Guise Of Federal Rule of Evidence 702

The district court compounded its over-reliance on the lack of evidence of paying PSNS users in the actual world by making factual findings on disputed questions of fact that Economides reasonably resolved in formulating his opinion. *See* Blue Br. 27–47.

Under Federal Rule of Evidence 702, whether an expert's "testimony is based on sufficient facts or data," Fed. R. Evid. 702(b), is a distinct inquiry from whether

"the testimony is the product of reliable principles and methods," *id.* at 702(c), and whether "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case," *id.* at 702(d). Subsection (b) does not authorize a district court to "weigh[] the evidence on record" or to "demand[] corroboration" of an expert's opinion. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022). In other words, it "requires foundation, not corroboration." *Id.* at 1025. The "key inquiry" is "whether an expert had sufficient factual grounds on which to draw conclusions, not whether the expert's hypothesis is correct or corroborated by other evidence on the record." *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024) (cleaned up). And "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

As discussed in more detail in Point I.B.2–4 of our opening brief and this reply, *infra*, the district court erred by excluding Economides based on the court's disagreement with Economides' factual conclusions, *see, e.g.*, 1-ER-21 ("The record demonstrates that these were internal trial balloons that never ripened into serious proposals or an actual practice."), even though Economides had "sufficient factual grounds on which to draw conclusions," *Hyer*, 118 F.4th at 1056 (citation omitted). We begin in Point I.B.1 by reviewing the relevant case law and responding to Meta's authorities.

### 1. Meta's Authorities Do Not Authorize A District Court To Make Findings On Underlying Facts Relevant To An Expert's Opinion

In *Elosu* (*see* Blue Br. 29–30; Red Br. 44, 46–47), the district court excluded an expert based on the court's determination that his ultimate conclusions were "contradicted" by eyewitness accounts, were "speculative and unsupported," and were not adequately "corroborated" by independent evidence. 26 F.4th at 1026–28. This Court reversed, holding that "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Id.* at 1026.

Meta seeks (Red Br. 46–47) to distinguish *Elosu* on the ground that the expert there (a fire investigator) used scientific analysis, while Professor Economides (an economist) allegedly did not. But *Elosu*'s rule about factfinding under Rule 702 is not limited to scientific methods, as *Teradata Corp. v. SAP SE*, 124 F.4th 555 (9th Cir. 2024), confirmed by applying *Elosu* in the antitrust context to reverse a district court's exclusion of an expert economist at the summary-judgment stage. Particularly instructive is *Teradata*'s analysis of an expert's opinion on harm to competition—where, as here, the excluded expert was an economist opining in the antitrust context:

> Asker's [the expert's] claim that customers actually use both runtime and full-use HANA [SAP's database product] as EDWs [enterprise data

8

and warehousing] was a "reasonable extrapolation[]" from the evidence. *Murray* [v. *Southern Route Mar. SA*, 870 F.3d 915,] 923 [(9th Cir. 2017)]. SAP business documents describe the company's strategy to use HANA to displace other EDW providers. And SAP's procompetitive justifications for the tie centered on HANA's ability to simultaneously leverage transactional and analytical capabilities. If customers did not use HANA as an EDW, the tie would not further SAP's purported strategic or procompetitive objectives. Given SAP's stated objectives, it was reasonable for Asker to conclude that customers use HANA as an EDW.

As with Asker's other conclusions, a trier of fact might disagree. But at this stage, it is not our role to determine "the veracity of the expert's conclusions." *Elosu*, 26 F.4th at 1026. Asker's assumption that runtime HANA provides analytical functionality is sufficiently plausible to constitute a "competing version[] of the evidence." *Id.*

124 F.4th at 571 (third set of brackets in original).

Meta argues (Red Br. 43–44) that *Teradata* reversed only the district court's holding that "'large enterprises' is too imprecise to describe a properly defined market," in contravention of the rule that "an antitrust plaintiff need not specify a market by precise 'metes and bounds.'" *Teradata*, 124 F.4th at 567. As an initial matter, the "metes and bounds" rule is similar to the "big red flag" approach the district court applied here because it requires too much precision in an expert's supporting evidence. *See* Point I.A, *supra*; 1-ER-19. But more importantly for present purposes, the *Teradata* holding block-quoted above was set forth independently in a later section of the opinion and concerned an entirely different element (harm to competition, as opposed to market definition). *Compare* 124 F.4th at 567, *with id.* at 570–72.

Meta's principal authority, *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) (cited at Red Br. 22–25), is inapposite. There, the plaintiff's experts opined that PCB exposure caused his small-cell lung carcinoma. *Id.* at 143–44. They relied on a set of animal studies in which infant mice given massive injected doses of PCBs developed a different cancer. *Id.* The Supreme Court held that the mice studies were "so dissimilar to the facts presented in this litigation" that they could not bridge the gap between the data and the opinion, and affirmed exclusion of the experts. *Id.* at 145–46. But here, the evidence does not require bridging any meaningful gap; for example, the ███ email and other proposals advocated paying users in the very Facebook/PSNS context at issue here. 4-ER-469–70; 4-ER-473, 505, 524–25; 5-ER-824–27. To be sure, Economides *additionally* relied on the market-research context by way of analogy, but *Joiner* would be instructive only if the market-research context Economides was so obviously different from the PSNS context that there could be no reasonable comparison. Meta, however, ███████████████ When considering whether to compensate certain Facebook (*i.e.*, PSNS) users, ████ ██████████████████████████████████████ ████████████████████████████████████████ 4-ER-461 (emphasis added).

Meta's remaining authorities involved experts who, unlike Economides, lacked any factual foundation for their opinions. In *Domingo v. T.K.*, 289 F.3d 600,

10

606 (9th Cir. 2002) (cited at Red Br. 26, 44), the expert's theory had not "ever been published," with no "objective source, peer review, clinical tests, [or] establishment of an error rate." *Id.* at 606. And in *Ollier v. Sweetwater Union High School District*, 768 F.3d 843 (9th Cir. 2014) (cited at Red Br. 14, 26), the experts toured a school facility in "cursory" walkthroughs, took "no photographs and no measurements," and offered "personal opinions and speculation." *Id.* at 860–61.

*Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025) (cited at Red Br. 6, 25, 47), similarly involved an expert who entirely lacked factual support. The expert asserted the plaintiff was "negative" for obesity based solely on a self-reported fact sheet, without reviewing any medical records, photographs, or BMI data. *Id.* at 1051–52. At a hearing, the expert conceded he "certainly can't say whether [the plaintiff is] obese or not." *Id.* at 1051. This Court held the expert failed to provide any reliable support for a factual premise upon which his analysis depended. *Id.* at 1052. And *Engilis* itself reaffirmed that *Elosu*'s "foundation, not corroboration" principle, *id.* at 1051, remains good law where the expert has evidentiary support but reasonable jurors could disagree with the expert's interpretation of that evidence.

That is the case here. As we show next in Point I.B.2–4, Economides' evidence included the uncontested proposition that Meta would respond in some way in the but-for world, *see* 1-ER-18, Meta's internal proposals to pay Facebook users

11

for their data, and other evidence supporting the conclusion that Meta would pay Facebook users for their data in the but-for world.

> **2.      Meta Does Not Persuasively Refute That Reasonable Jurors Could Rely On Evidence That Meta Considered Paying Facebook Users For Their Data**

***The*** ███ ***proposal***.  This Court need look no further than the ███ proposal, which the district court conceded "indicates that Meta on one occasion considered competing on 'price' in the market" for PSNS users' data, before the court dismissed it as "too thin a reed" to support Economides' opinion.  1-ER-23; *see also* 1-ER-21 (finding that the ███ email and other Meta proposals "were internal trial balloons that never ripened into serious proposals or an actual practice").

Reasonable jurors could give the ███ proposal substantially more weight than the district court did.  ████████████████████████████████ 4-ER-470.  ████████████████████████████████████

████████████████████████████████ 4-ER-469.  ███ explained that ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ 4-ER-469–70.  ███ concluded: ████████████████████████

████████████████████████████████████ 4-ER-470.  ███ framed the proposal in ████████████████████████

12

███████████████████████████████████████████████████████

██████████████████████████████████████ 4-ER-470.

Unlike the district court, ███████████████████████████

██████, and unlike Meta's answering brief, ████████████████ as

"someone with no product, sales, or marketing responsibility[.]" Red Br. 35.  To the

contrary, ██████████████████████████ 4-ER-469.

Meta also argues (Red Br. 35) that ██████ proposal concerned "enriched" data

beyond what Meta ordinarily collects.  To the contrary, ████ compared users who

███████████████████████████████████████████████████████

██████████████████ 4-ER-469–70.  "Enriched" data is the data Meta was

*already collecting*—the proposal was about compensating users for not opting out

and thus continuing to provide that data.  In any event, Meta's critiques are disputes

concerning the evidence and its significance, which are for a jury, not the district

court, to resolve.

***Project Bluejay and Offsite Signal Loss.***  Project Bluejay was a ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ 5-ER-691; *see also* Blue Br. 33.  The related Offsite Signal Loss program

explored ████████████████████████████████████████████

13

███████████████████████████████████████████████████████

Blue Br. 34-36; 5-ER-693.

Meta's responses (Red Br. 34–38) again merely highlight factual disputes that should have been resolved by a jury, not the district court.

*First*, Meta's derision of these programs as "preliminary brainstorms" that "never ripened into serious proposals" (Red Br. 34 (quoting 1-ER-21-22)) is contradicted by the record. For example, Zuckerberg testified that Meta has ████

████████████████████████████████████████████████

████████████████████████ 4-ER-642. As to Project Bluejay specifically,

████████████████████████████████████████████████

████████████████████████ 4-ER-644. Similarly, as to Offsite Signal Loss, Meta employees explained that ████████████████████████████

such that ██████████████████████████████ including ████

████████████████████████ 4-ER-465.

*Second*, Meta argues (Red Br. 37) that Project Bluejay ███████████

███████████████. But that corroborates, not undermines, Economides' opinion because his model ████████████████████████████████████████

████████████████████████████████ 5-ER-686; *see also*

5-ER-692.

14

*Third*, Meta contends (Red Br. 38) these proposals involved data "different" from that for which Economides opined Meta would pay. 1-ER-22. That is factually wrong, and at the very least, it is a disputed issue whose significance (if any) is for a jury (not the district court) to decide. The Project Bluejay and Offsite Signal Loss proposals were possible strategies ███████████████████████████ ████████████████████████████████████████████████ 5-ER-692, 825—███████████████████████████████████████████████ ████████████████████████████ 5-ER-685–86. These were *not* proposals to obtain ████████████████████████████████████████ ███████████████████████████ 4-ER-505 (Project Bluejay; ████████████ ████████████████████████ (emphasis added)); 4-ER-535 (Offsite Signal Loss; ████████████████████████ (emphasis added)). We cited this evidence (Blue Br. 34–35), and Meta failed to address it. Like Meta, the district court "overlooked" the evidence upon which the expert "actually relied ... in rendering his opinion." *Hyer*, 118 F.4th at 1056. That "constitutes an abuse of discretion" demanding vacatur. *Id.*

*Fourth*, Meta argues (Red Br. 35–36) that neither proposal contemplated uniform payment to all users. But the district court addressed only Economides' opinion that Meta would pay compensation in the but-for world, not whether the payment would be uniform for every user. 1-ER-21–23. In any event, as explained

in Point I.C., *infra*, Meta's arguments about uniform payment again raise factual disputes that would be inappropriate for the district court (rather than a jury) to resolve.

**Data Dividend.** The Data Dividend proposal, under which Meta would

███████████████████████████████████████████████████████████████

███████████████████████████████████████ Blue Br. 35–36; 4-ER-571; 5-ER-694–95; 5-ER-826. The district court acknowledged this proposal, but then rejected it on the basis that Economides' analysis of it was supposedly "perfunctory." 1-ER-22.

Meta's arguments (Red Br. 38) again raise factual disputes or are otherwise unpersuasive. Meta argues the dividend would have been ██████████████

██████████████████████████ (Red Br. 38 (quoting 4-ER-571))—but that goes to uniformity, a question the district court did not reach. Meta quotes the proposal's warning that, in a payment program, ███████████████████████████████ (Red Br. 38).[1] But Economides explained why that was no issue: Meta already has

---

[1] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████ 5-ER-741. Economides explained that ████████████ is one reason why Meta would ██████████
████████████████████████████████████████████████████ 5-ER-741.

16



5-ER-698–99.

### 3. Meta Does Not Persuasively Refute That Reasonable Jurors Could Rely On Evidence That Meta And Other Companies Paid Participants In The Market-Research Context

As shown above, Economides had ample support from the PSNS context alone to opine that Meta would have paid Facebook users for their data in the but-for world. His reliance on evidence of payments in the analogous market-research context ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 5-ER-833–35.

Meta argues (Red Br. 31–34) that the market-research context is too different from the PSNS context. But Judge Koh relied on such evidence in this very case to find it plausible that, in the but-for world, Meta could pay users for their data in the PSNS context too. *See* 2-ER-154 ("Consumers identify examples of companies that have been willing to pay users for information[.]"); *id.* ("Facebook itself paid certain users 'up to $20.00 per month[.]'").[2]

---

[2] Judge Koh's mention of Meta's paying users "up to $20.00 per month" refers to one of Facebook's early market-research services known as "Research." 2-ER-154, 265. Meta's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Two district judges (cited at Blue Br. 39–40, but ignored by Meta) also relied on a similar analogy. *See Brown v. Google LLC*, Case No. 20-cv-3664, 2022 WL 17961497, at *5 (N.D. Cal. Dec. 12, 2022); *Rodriguez v. Google LLC*, 772 F. Supp. 3d 1093, 1109–1110 (N.D. Cal. 2025). Specifically, *Brown* and *Rodriguez* admitted expert opinions that relied on the market-research context to support a conclusion that users' data has value and that the defendant would pay for such data in other contexts (web browsers in *Brown*, and mobile devices in *Rodriguez*).

In *Brown*, Google moved to exclude the plaintiffs' expert's damages opinion in a privacy class action where the expert used Google's own Screenwise Panel— one of the same market-research programs Economides relies on here—to value at $3 per user the data Google collected from Chrome (a Google web-browsing service) users. 2022 WL 17961497, at *3–5. Google's objections tracked Meta's here: the $3 input was "speculative and unreliable," the Screenwise data differed from the at-issue data, and user benefit and privacy valuations varied. *Id*. at *4–6.

The court rejected each, holding that the expert's analysis was "logical and reliable" and that Google's arguments "go to weight, not admissibility." *Id*. at *5–6. The court later denied summary judgment, finding a triable issue on whether "there is a market for [user] data." *Brown v. Google LLC*, 685 F. Supp. 3d 909, 940

5-ER-687–90, 718.

(N.D. Cal. 2023). In so holding, the court relied on the fact that "Google itself has piloted a program [Screenwise] where it pays users \$3.00[.]" *Id.*; *see also Rodriguez*, 772 F. Supp. 3d at 1109–10 (denying summary judgment where plaintiffs presented evidence that mobile-device user data collected through Google's software had economic value, relying on *Brown*).

Meta does address (Red Br. 33) *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (cited at Blue Br. 39), but unpersuasively. In that case, this Court accepted at the pleading stage that Facebook users' browsing histories "carry financial value" based on "research panels that pay participants" for similar data. 956 F.3d 589, 600 (9th Cir. 2020). Meta contends (Red Br. 33–34) that *Internet Tracking* did not resolve a Rule 702 question, but ignores that it credited the same analogy to the market-research context upon which Economides relied.

Those authorities apply *a fortiori* here because Meta's own contemporaneous documents (unlike its answering brief in this appeal) equated the PSNS and market-research contexts. For example, when Meta ██████████████████ ███████████████████████████████████████████████████ ████████████████████████████ 5-ER-734. Likewise, Meta employees ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████

19

████████████████ 4-ER-461.   Economides also conducted a systematic

comparison ████████████████████████████████████████████████

████████████████████████████████   5-ER-732–34; 5-ER-834–35.

Meta's answering brief fails to confront this evidence.[3]

**4.     Meta Does Not Persuasively Refute That Reasonable Jurors Could Rely On Academic And Governmental Literature Supporting That Greater Competition Can Lead A Service To Pay Users**

Meta argues (Red Br. 39–41) that Economides' reliance on academic and

governmental literature is insufficient.   But we never argued the literature alone

required admission of Economides' opinion.   And the district court acknowledged

the literature provided some foundation for Economides' analysis, stating that

Economides cited "credible sources" and that the notion of "negative prices" (*i.e.*,

payments *to* a user of a service rather than receipt of payments *from* a user) is "not

bunkum." 1-ER-17.

**C.     Meta's Remaining Arguments Unpersuasively Seek Affirmance On Grounds The District Court Did Not Reach**

The district court analyzed Economides' opinion that, in the but-for world,

Meta would have paid users *some amount* for their data, as distinguished from a

---

[3]   As we explained (Blue Br. 42–43), the district court also erred in rejecting the market-research programs as involving ████████████████████████████████

████████   *See* 5-ER-732–34; 5-ER-834–35. Meta does not address this point either. Red Br. 31–34.

different response such as improving the quality of its service.  1-ER-17–18; 1-ER-23–24.  But Meta goes further, criticizing Economides' opinions that Meta would have paid each user the *same* amount, and that the amount would have been $5, $3.50, or $6.25 per user per month.  This Court typically remands for the district court to address such issues in the first instance, *see, e.g.*, *Hollis v. R&R Restaurants, Inc.*, 159 F.4th 677, 687 (9th Cir. 2025), but in any event they do not support excluding Economides' opinions or granting summary judgment to Meta.

1.      Meta argues (Red Br. 28–30) that uniform payments are economically irrational because users differ in their value to Meta, inactive users would receive windfalls if Meta made uniform payments, and some users generate little or no advertising revenue.  Meta asserts that "Economides had no explanation for why Meta" "would have paid *every single user* a *uniform* $5 per month[.]"  Red Br. 2 (emphasis in original).

Meta mischaracterizes the record.  Meta's ███████████████████ ███ *agreed* that ██████████████████████████████████████

█████████████████████████████████████████████████████████

2-SER-183 n.94.  Further, in the analogous market-research context, Meta ███

█████████████████████████████████████████████████████████

██████    5-ER-703 ¶ 264 & n.681; *see also* 5-ER-740–41 ¶ 345 (████████

21



).

In light of this and other record evidence, Economides provided reasonable answers to each of Meta's critiques, explaining, for instance, that ▮▮▮▮▮

2-SER-274–75; *see also* 5-ER-702–707, 740–41, 827–28, 838–39.[4] To the extent Meta now argues the opposite, Meta raises a dispute that goes to the weight of Economides' testimony, not its admissibility. *Elosu*, 26 F.4th at 1025 ("Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge."); *see also Brown*, 2022 WL

---

[4] Nor, contrary to Meta's assertion (Red Br. 36), did Economides ignore an article

2-SER-274. Economides explained that the article

FER-12 ¶ 313; FER-16 ¶ 71. Having analyzed the actual evidence in this case—including Meta's

FER-10–13 ¶¶ 311–19; FER-15–17 ¶¶ 69–77. In any event, the district court did not rely upon this supposed inconsistency (there is none) as a basis for its decision, and Meta's critique at best goes to weight, not admissibility.

22

17961497, at *6 (holding that defendant's disagreement with plaintiff expert's opinion that defendant would have paid users for their data using a "base rate" did not warrant exclusion of expert's opinion).

Contrary to Meta's argument (Red Br. 29–30), our other economics expert (Dr. Joseph Farrell) did not cast doubt on Economides' opinion. Meta points to a 1988 article that Farrell co-authored, which addressed whether ███████████

████████████████████████████████████

████████████████████████████████████

████████████████████████ Red Br. 30 (quoting 2-SER-245–46 (emphasis added)). This has nothing to do with Meta or Meta paying users in exchange for their data (indeed, the 1988 article predates Facebook by more than a decade). It is about paying consumers to *take something from* a company, not paying users for something they *provide to* the company. And even in the context of paying a consumer to take something from a company, Farrell stated that ███████████

████████████████████████████████████

████████████ 2-SER-246. In any event, the district court's orders did not invoke Farrell in this regard, and this, at most, creates another dispute for the jury to resolve.

2. On Economides' figures of $5, $3.50, or $6.25, even if they are unsustainable, it would not follow that the named plaintiffs or other putative class members suffered no antitrust injury. The Supreme Court has long held that

23

"damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *J. Truett Payne*, 451 U.S. at 565–66 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24 (1969)). Where, as here, injury is established—*i.e.*, every class member received $0 in the actual world, but would have received some amount of payment in the but-for world—but the precise amount remains contested, "the fact that its extent is uncertain does not prevent a recovery." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 566 (1931) (citation omitted); *see also J. Truett Payne*, 451 U.S. at 567 n.5. The appropriate course is for the jury to determine the appropriate amount, not for the court to grant summary judgment to the defendant. *Bigelow*, 327 U.S. at 264–65 (the jury may make "a just and reasonable estimate of the damage based on relevant data," and "the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable").

3. Meta's Statement of the Case (Red Br. 15–16), but not its Argument, goes beyond the district court's opinion and contends that Klein and the other two named plaintiffs contradicted Economides' opinion that Meta would make a uniform payment to users in the but-for world. At most, ██████████████████████████

██████████████████████████████████████████████

24

██████████████████ 2-SER-72; 2-SER-300–01; 2-SER-295–96. But Meta's wrongdoing deprived them of that choice. Under *Bigelow* and *J. Truett Payne*, it would be perverse for Meta's own misconduct to immunize it from a fair approximation of damages.

More fundamentally, Meta's argument misses the point. Whether Plaintiffs in a *but-for* world would or would not accept payment does not dictate whether they were harmed in the *actual* world. In the actual world, Meta took something (data) from Plaintiffs and other users for free that had monetary value; they are therefore injured because they did not receive that value, regardless of their subjective views as to the precise value. As Economides explained, ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ FER-20 ¶¶ 86–87.

Further, as Economides explained, in the but-for world, Facebook users would have ██████████████████████████████████████████

████████████████████████████████████████████

5-ER-707. A user who would opt out in the but-for world is *not* without injury. Instead, $5 (Economides' estimate of the payment amount to users in the but-for world who opt in) is a *conservative* estimate of harm to such a user, because she would opt out only because she values her data at more than $5. 5-ER-707, 715.

25

That user is still injured by at least the $5, because while in the but-for world she would opt out and Meta would not collect her data, Meta in the actual world *did* collect her data and thus owes her the market price that Meta would have offered for the data (even if the value to that user is even higher than that).

While Meta may disagree with these theories and explanations, that dispute is for a jury to resolve. At most, Meta's arguments raise questions about the amount—not the fact—of injury, which does not preclude certification of a class. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022) (*en banc*) ("[A] district court is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial"); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) ("[T]he need for individualized findings as to the amount of damages does not defeat class certification").

## II. THE PARTIES AGREE THAT THE DISTRICT COURT'S ORDER DENYING CLASS CERTIFICATION, LIKE THE COURT'S ORDER GRANTING SUMMARY JUDGMENT TO META, RESTS ON THE COURT'S EXCLUSION OF PROFESSOR ECONOMIDES' OPINION

Beyond Meta's arguments addressed in Point I above, Meta's only argument in defense of the district court's denial of class certification is that, "[w]ithout Economides," Klein could not "prov[e] injury on a class-wide basis." Red Br. 55, 53. Because the district court erred in excluding Economides as explained above, the court necessarily also erred in denying class certification. *Sali v. Corona Reg'l*

26

*Med. Ctr.*, 909 F.3d 996, 1004–07, 1012 (9th Cir. 2018) (reversing denial of class certification where "district court applied the wrong standard for evaluating the plaintiffs' evidence").

Meta cites (Red Br. 54) *Grodzitsky v. American Honda Motor Co.*, 957 F.3d 979 (9th Cir. 2020), where this Court affirmed exclusion of an expert and the resulting denial of class certification. *Grodzitsky* supports us, not Meta. *Grodzitsky* held that "a district court errs when it 'limit[s] its analysis of whether there was commonality to a determination of whether Plaintiffs' evidence on that point was admissible.'" 957 F.3d at 986 (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). That is what the district court did here: it excluded Economides and treated that exclusion as dispositive of certification. 1-ER-24–26.

Moreover, the expert in *Grodzitsky* was nothing like Economides. He asserted that vehicle window regulators were defective, but he relied on no industry standards, no peer-reviewed literature, no consumer studies, and no data on replacement rates. 957 F.3d at 981-83. Without the expert's testimony, the plaintiff had only "a series of window regulators that may or may not have broken before they were supposed to, and these breakages may or may not have been caused by a common defect which may or may not exist." *Id.* at 984. Economides, by contrast, relied on Meta's internal documents, market-research evidence, and academic and governmental literature—all of which the district court acknowledged provided

27

"credible" support. 1-ER-17. If this Court vacates the district court's exclusion of Economides' opinions, as this Court should, *Grodzitsky* requires that the district court's denial of class certification be vacated as well.

## **CONCLUSION**

This Court should vacate the district court's grant of summary judgment and denial of class certification and remand for further proceedings in which Economides' antitrust-injury opinions are admitted.

Dated: June 12, 2026

Shana E. Scarlett
  shanas@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Respectfully submitted,

By: *s/ Sanford I. Weisburst*
  Sanford I. Weisburst
  sandyweisburst@quinnemanuel.com
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

Kevin Y. Teruya
  kevinteruya@quinnemanuel.com
Adam B. Wolfson
  adamwolfson@quinnemanuel.com
Brantley I. Pepperman
  brantleypepperman@quinnemanuel.com
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

28

Laya Maheshwari
layamaheshwari@quinnemanuel.com
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
110 Huntington Ave, Ste. 520
Boston, MA 02199
(617) 712-7100

29

## <u>STATEMENT OF RELATED CASES</u>

**9th Cir. Case Number(s)** <u>25-6858</u>

      In accordance with Ninth Circuit Rule 28-2.6, the undersigned attorney states the following:

[✓] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court.  The case number and name of each related case and its relationship to this case are:

**Signature**  <u>*s/ Sanford I. Weisburst*</u>      **Date** <u>June 12, 2026</u>

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** 25-6858

I am the attorney or self-represented party.

**This brief contains  6,789  words,** including  0  words manually counted in

any visual images, and excluding the items exempted by FRAP 32(f).  The brief's

type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[✓] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   *s/ Sanford I. Weisburst*            **Date**  June 12, 2026

31

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2026, I caused a true and correct copy of the foregoing brief to be served by email on counsel for all parties as well as pertinent non-parties whose confidentially designated information was cited in Appellants' brief and/or further excerpts of record, as reflected in the attached service list, including to afford them the opportunity to seek to seal the applicable portions of this brief and Appellants' further excerpts of record.

By:     *s/ Sanford I. Weisburst*
          Sanford I. Weisburst

### SERVICE LIST FOR PLAINTIFFS-APPELLANTS' REPLY BRIEF

| Party/Non-Party | Counsel Name | Counsel Email Address |
| --- | --- | --- |
| Meta Platforms, Inc. (Defendant) | Aaron Panner | apanner@kellogghansen.com |
|  | Sonal Mehta | sonal.mehta@wilmerhale.com |
| Microsoft Corporation | Amy Ray | amyray@orrick.com |

33